# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 18, 2013

## STATE OF TENNESSEE v. RONALD W. DAMON

**Appeal from the Circuit Court for Rutherford County**
**No. F65181A    Don R. Ash, Judge**

---

**No. M2012-02263-CCA-R3-CD - Filed April 25, 2014**

---

The Defendant, Ronald W. Damon, was convicted by a Rutherford County Circuit Court jury of two counts of especially aggravated kidnapping, Class A felonies; aggravated robbery, a Class B felony; aggravated burglary, a Class C felony; and conspiracy to commit aggravated burglary, a Class D felony. *See* T.C.A. §§ 39-13-305 (2010) (especially aggravated kidnapping), 39-13-402 (2010) (aggravated robbery), 39-14-403 (aggravated burglary), 39-12-103 (2010) (criminal conspiracy). The trial court sentenced the Defendant to consecutive terms of twenty-three years as a violent offender for each of the especially aggravated kidnapping convictions, eleven years as a Range I, standard offender for aggravated robbery, nine years as a Range II, multiple offender for aggravated burglary, and seven years as a Range II, multiple offender for conspiracy to commit aggravated burglary. On appeal, the Defendant contends that (1) the trial court erred in denying his motion for a judgment of acquittal or a new trial, (2) the evidence is insufficient to support his convictions, (3) the court erred in allowing an eight-day break in the trial between the proof and the closing arguments, (4) the court erred in excluding the testimony of a 9-1-1 operator regarding one of the victim's statements, (5) the court erred in admitting testimony about a letter he wrote, (6) the court erred in admitting evidence of his prior bad acts, (7) the court erred in allowing the State to play portions of a video recording of his pretrial statement, (8) the court erred in allowing a jail inmate to testify without being subject to cross-examination about the truthfulness or falsity of his prior testimony in another matter, (9) the court erred in admitting testimony about his financial problems despite the witness's lack of personal knowledge, (10) the court erroneously admitted evidence in his first trial that resulted in a hung jury but would have resulted in an acquittal if the evidence had not been admitted, and (11) the court erred during sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Ben Hall McFarlin, III, (at trial and on appeal), Ken Burger (at trial), and Claire Burger (at trial), Murfreesboro, Tennessee, for the appellant, Ronald W. Damon.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to a home invasion and injuries to Edna Story and Cecil Story. The Defendant was charged along with two codefendants, and he received a separate trial.

At the trial, Cory Foster testified that he had known the Defendant for a few months in December 2009. They were neighbors, and their children played together. He said that although he was unemployed, he sometimes worked for his father's heating and air conditioning business and on a farm where the Defendant obtained work for them. He said he met Cecil Story through the Defendant. He and the Defendant cut, cleared, and burned trees, painted, and performed other labor for Mr. Story. He said that he had financial problems and that Mr. Story bought lunch, cigarettes, gas, and beer for him and the Defendant. He said that although he did not know the details, he was aware the Defendant had financial problems. He said the Defendant's car was "towed away on a rollback in front of his house." He said he and the Defendant had not spoken for "at least a couple of weeks" before the events in this case.

Mr. Foster testified that the Defendant took gas from the Storys' farm and put it into the Defendant's car without Mr. Story's knowledge. He said the Defendant took scrap copper from the Storys' farm, put it into Mr. Foster's trunk, and asked if Mr. Foster could "get rid of it." He said that he told the Defendant he could but that the copper was still in his trunk when the police searched his car. He said Mr. Story did not give anyone permission to take the copper.

Mr. Foster testified that the Defendant talked to him about burglarizing the Story home. He said that they went to the Story farm one day for work, that no one was home, and that the Defendant told him it would be "a good score." He said that he did not want to be involved and that he left with the Defendant in his car. He said the Defendant mentioned once or twice that there might be around $100,000 and a valuable guitar at the Story house.

Mr. Foster testified that he knew James Charlie Pittard and estimated he had seen the Defendant and Mr. Pittard together ten to fifteen times. He said Mr. Pittard drove a black Blazer and Mr. Pittard's father's white F-150 extended cab truck with a tool box.

Mr. Foster testified that on the evening of December 27, 2009, he was at his father's house in Woodbury. He said the Story house was in Eagleville. He agreed he provided the police with information or assistance in the arrest of Ashton Garza relative to this case. He thought the Defendant's car was towed when it was repossessed. He said that after the car was repossessed, he gave the Defendant rides but that later, Mr. Pittard gave the Defendant rides. Mr. Foster thought "his wife's kinfolk" gave the Defendant rides, although he did not specify to whom he referred.

On cross-examination, Mr. Foster testified that he worked for Mr. Story for two weeks to a month. He said that before the Defendant's car was repossessed, he rode with the Defendant to the Storys' property but that he drove them afterward. He said he drove his car to the Storys' property, not his girlfriend's Dodge Durango.

Mr. Foster testified that he met Mr. Garza through a friend who was a Marine and agreed he and Mr. Garza were friends. He denied buying a car from Mr. Garza but said he bought one from Mr. Pittard. He agreed he requested reward money for helping the police with Mr. Garza's arrest but said he did not receive it. He said, though, that he became involved because he did not want Mr. Garza to hurt him or his family.

Mr. Foster testified that it was difficult to tell when the Defendant was serious or joking. He said that when the Defendant mentioned robbing the Storys, he thought the Defendant "was joking more than being real at the moment," although he was unsure if the Defendant was serious. He said he probably would not have gone to the police because he thought it was better if he did not become involved with the police. He did not recall if Mr. Story's gas was ever put into his car. He agreed Mr. Story provided gas if they asked, although he said Mr. Story sometimes did not have cash. He said Mr. Story was good to them. Regarding the copper, he said he told the Defendant "maybe" he would dispose of it. He said he did not contact the authorities because he thought it was better not to talk to them. He agreed he was not charged with possession of stolen property relative to the copper.

On redirect examination, Mr. Foster testified that he could not tell if the Defendant was joking about robbing the Storys and that the Defendant could have been testing him. He said that when he drove away, the Defendant did not say he had been joking.

Mr. Foster testified that a person could not sell copper without a heating and air conditioning (HVAC) license. He said that the Defendant did not have a HVAC license but

that the Defendant knew Mr. Foster and his father were in the HVAC business. He said that when he talked to the police, he told them about the copper the Defendant put into his trunk.

On recross-examination, Mr. Foster testified that he did not think he was being dishonest by leaving the copper in the trunk of his car and not telling the authorities. He said he probably would not have talked to the authorities unless someone were going to do something to him or told him he had to do something. On further redirect examination, Mr. Foster testified that he was the follower and the Defendant was the leader regarding the copper.

Rutherford County Sheriff's Dispatcher Tracey Hackney testified that she received a call for help from Ms. Story at 10:13 p.m. on December 27, 2009. She said that the first responders arrived at 10:33 p.m. and that Deputy Pinson was dispatched at 10:42 p.m.

Rutherford County Sheriff's Corporal William Pinson testified that he went to the victims' house on December 27, 2009, searched briefly for suspects, and helped secure the scene. He said that Ms. Story had a cut on the bridge of her nose, that her face was covered in blood, and that she appeared dazed. He said Mr. Story had a wound on his upper lip. On cross examination, he said he did not see anything that made him think the Defendant was involved. On redirect examination, he said he did not see anything that made him think Mr. Pittard or Mr. Garza were involved.

Rutherford County Paramedic Steve Hollandsworth testified that he and Vernon Williams responded to the scene, although a delay existed in their reaching the victims while the sheriff's department secured the scene. He said that Mr. Story's injuries were to his face, that his shirt was bloody, that blood was on the floor near him, and that his upper lip was split. He said that Ms. Story had head injuries but did not recall what they were. He identified a photograph of Mr. Story, which depicted Mr. Story's condition on December 27, 2009.

On cross-examination, Mr. Hollandsworth testified that he saw blood in the Storys' house but that he did not notice any footprints in the blood. He did not recall seeing blood on objects around the room. He thought Ms. Story was in a different room than Mr. Story. He treated Mr. Story, and Mr. Williams treated Ms. Story.

Rutherford County Paramedic Vernon Williams testified that after the sheriff's department cleared the scene, he and Mr. Hollandsworth went to the victims' house. He said that the house was in "kind of a disarray" and that the victims were covered in blood. He did not recall Mr. Story's injuries and said Mr. Hollandsworth treated Mr. Story. He said the area around Mr. Story was bloody. He said Ms. Story had several "skin tears" on her arms

and face. He thought the skin tears on her arms were around her wrists and said she may have had skin tears around her legs, also. He described a skin tear as an area with tissue pulled away from a cut. He said the facial injury was to the bridge of her nose. He identified a photograph of Ms. Story that depicted her condition on December 27, 2009.

On cross-examination, Mr. Williams testified that Mr. and Ms. Story were in different rooms when he and Mr. Hollandsworth arrived. He thought he treated Ms. Story in the kitchen. He said that Ms. Story was no longer bleeding when he treated her. He saw a lot of blood in the room where she was and thought blood was tracked throughout the house, although he did not recall seeing footprints in the blood. He did not recall blood on the walls or door knobs.

The jury was informed of the parties' stipulations:

That Edna Story suffered serious bodily injury that included a closed fracture of the nasal bones, multiple open wounds to her body including but not limited to an open wound to [her] wrist and an open wound to her knee. And that these injuries substantially impaired the use of one or more of her bodily members, organs or functions and also caused extreme physical pain. Number two, that Cecil Story suffered serious bodily injury that included a non-displaced fracture line in the anterior, medial and lateral walls of both maxillary sinuses, a focal depression in the left lateral orbital floor with suspicion of a fracture and multiple contusions and lacerations that resulted in the loss of consciousness, extreme physical pain and substantially impaired the use of one or more of his bodily members, organs or functions.

Rutherford County Sheriff's Deputy Matthew Moseley testified that he responded to the victims' home on December 27, 2009. He said that the victims were already in an ambulance when he arrived and that he was instructed to follow the ambulance and obtain their statements. He said that they were interviewed separately, that he had their statements typed, and that he had the victims sign the statements. He identified and read Mr. Story's statement, which stated:

When I got to the door I thought it was maybe the girl over next door and I opened the door. And when I did he clobbered me I guess. The next thing I knew I was back in the floor away from the door and blood was all over the place. He had tried to tie me up or was tying me up so I must have passed out for a few seconds anyway. They went through the house and tore the house all to pieces. They were looking for money, but I told them there wasn't any money.

-5-

Deputy Moseley identified and read Ms. Story's statement, which stated:

I was sleeping but I heard the knock at the door. And I got up to go answer it. But when I got up to where I was going to answer it, my husband came up and I let him answer it. When he did there was two men he said at the door. Next thing I know one of them jumped him and put him on the floor. And then the other jumped me and put me on the floor. We weren't allowed to look up at all and if you did try to look up you were going to get hit or hurt. So we did what they said. He got beat up worse than I did. Anyway, I actually didn't get to see anything.

On cross-examination, Deputy Moseley testified that neither victim said anything about recognizing the perpetrators' voices. On redirect examination, he said he asked them if they recognized any voices. He said they could not identify anyone by sight.

Eagleville Church of Christ Minister Jim Lawyer testified that the victims and the Defendant were members of his congregation. He said the Defendant began attending at the invitation of another member, Michael Loyd, Jr. He identified a church directory that contained photographs of the victims, the Defendant and his family, and Mr. Loyd and his former wife.

Rev. Lawyer testified that after the Defendant began attending church, he learned from the Defendant and Mr. Story that the Defendant began doing farm work for Mr. Story. He described the Defendant's family as being in "pretty dire straits" financially. He bought diapers and baby formula and gave them money for gas and utilities.

Harry Barnes testified that the victims were his aunt and uncle. His grandmother left a farm to her daughters, who were his mother and Ms. Story. He said that his mother and Ms. Story divided the farm and that the Storys built a house on half. He said that after his mother died, he kept forty-nine to seventy-five cattle on the farm and worked with Mr. Story to care for them. He said that he went to the farm two to five days a week and that he saw the Storys when he was there.

Mr. Barnes testified that Mr. Story introduced him to the Defendant at the farm. He stated that they took twelve cattle to the stockyard on December 9 or 10 and December 17, 2009, and that they received $5000 to $6000 for them. He said that on December 17, the Defendant had car trouble and had two males with him to help load cattle with Mr. Barnes and Mr. Story. Mr. Barnes said he had never seen the two males before December 17.

Mr. Barnes testified that he saw Mr. Story give the Defendant a $100 bill at least once and that he thought the payment was excessive for working from 9:00 or 9:30 a.m. until 2:00 or 3:00 p.m. He said he spoke with Mr. and Ms. Story about it because it occurred often. He said Mr. Story stated that he gave the Defendant money for rent at least three times and for car repairs. Mr. Barnes agreed Mr. Story was talkative and said he talked about money in front of people he should not. He said Mr. Story was vulnerable to telemarketing and mail sweepstakes scams. He said the Defendant was present when he and Mr. Story discussed the proceeds of the stockyard sales. He said he told Mr. Story numerous times not to talk about money to strangers. He identified a map depicting the farm.

On cross-examination, Mr. Barnes agreed that the Defendant came to the Storys' farm "almost too much" looking for money and work. He said Mr. Story was eighty-seven years old. He did not remember the names of the men who were with the Defendant on December 17, 2009. He said one of the males was around fourteen or fifteen years old and wore a red shirt, which he said scared the cattle. He said Mr. Story asked the person to remove the shirt. He said the other male was around the Defendant's age.

Mr. Barnes agreed that payments from the stockyard were made by check, not cash. He agreed that given Mr. Story's financial assistance to the Defendant, it would not make sense for the Defendant to be involved in the crime.

On redirect examination, Mr. Barnes agreed that it might be worth "killing the golden goose" for $100,000 or a violin worth several thousand dollars and if two other people would do the "dirty work" while the person stole the property. He said Mr. Story received a "fair amount of money" in the two weeks before the crime. He thought two of the cattle sold were his and the others were Mr. Story's. He did not know if Mr. Story cashed the stockyard checks. He said Mr. Story always had cash and preferred cash transactions.

On recross-examination, Mr. Barnes testified that to his knowledge, there was never $100,000 cash in the Storys' house. He said the Storys were "very poor generally speaking." He said that they lived on the farm all their lives, that Mr. Story never made much money, that Ms. Story retired from AT&T and received "a little" retirement and Social Security benefits. He thought Mr. Story received spousal benefits from Social Security. He said Mr. Story talked about a violin and a guitar, but he did not know if they were taken in the crime. On further redirect examination, he said Mr. Story told him the violin was valuable. He said Mr. Story kept the violin in a case.

John Story, the victims' son, testified that his mother was ninety-three years old and that his father was eighty-seven when the crime occurred. He said that at the time of the crime, his mother's weight in pounds was in the upper eighties and that she was frail.

Mr. Story testified that he met the Defendant once at the farm when the Defendant was helping his father work. He said his father was talkative and talked about money to people. He did not know if his father talked to the Defendant about money. He said his father's memory was not good but was "okay" considering his age.

Mr. Story testified that after a police officer came to his house, he went to the hospital to see his parents. He said his mother's wrists were bandaged. He did not recall if her face was bandaged or injured. He said his father was in "pretty bad shape" with his mouth or lip "totally red."

Mr. Story testified that after the crime, he and several other people, including Rev. Lawyer, cleaned the victims' house. He said a large pool of blood was on the floor. Referring to a diagram, he described the house and the location of the blood. He said papers that had been in a hutch covered the floor. He said the contents of dresser drawers in his father's bedroom had been dumped on the floor. He said that his father had a couple of violins but did not know if they were valuable, that his father had a valuable guitar, and that his father had a shotgun. He said his mother's bedroom did not seem to have been disturbed. He said he later learned his parents kept cash in his mother's bedroom. He was unable to find the cash in his mother's room the first time he searched but found it the second time.

Mr. Story testified that he and Mr. Barnes discussed Mr. Barnes's concerns about the Defendant's frequent appearances at the Storys' farm. He did not recall if he discussed Mr. Barnes's concerns with his father. He said the cash he found in the closet totaled $6200.

On cross-examination, Mr. Story testified that he was aware of the Defendant's contact with his father but was unsure how much contact the Defendant had with his mother. He said his mother mentioned "they" ate a meal with them once, although Mr. Story never saw the Defendant in the house. He said his father told him the guitar was worth about $70,000. He agreed his father talked a lot about the value of things. He said that although it was possible his father talked about the guitar's value around the Defendant, he was not present for any such conversation. He was unaware of his parents having any dealings with Mr. Garza and Mr. Pittard.

Mr. Story testified that the police officers told him they had taken as evidence the cover to a security box. He had no knowledge of any damage or tampering to the box. He was not aware of any facts to suggest Mr. Garza or Mr. Pittard knew the security code for the gate. He said Mr. Barnes, Mike Frozier, and he knew the code. He said that his parents were "very competent" mentally given their ages and that his mother had some vision problems.

Mr. Story testified that he talked to his parents at the hospital. He said they were in separate rooms. He said his mother appeared to be in pain and scared. He stated that she said two men broke into the house, beat them, and tied them up.

On redirect examination, Mr. Story testified that he talked to his mother around 2:00 a.m. after the police talked to her. He agreed she talked to several people before him. He did not know if she told him what she saw when she said two men beat them. He agreed that in his mother's 1:00 a.m. statement, she did not say that she saw two men but stated that her husband said there were two men. He identified a photograph exhibit depicting the front panel of the security box. He did not think it was damaged when it was returned. He did not know if it had been "messed with" by anyone who came to rob his parents.

Eighty-seven-year-old Cecil Story testified that his wife, Edna Story, died after December 2009. He said that in December 2009, Ms. Story had lost a significant amount of weight, that she weighed about seventy pounds, and that a diagnosis had not been determined. He said he raised cattle on a 103-acre farm. He said he had about fifty-five head of cattle, nine donkeys, a dog, a cat, and a guinea. He said he had two dogs in 2009. He said that one of the dogs was large and could not hear and that the other was a small dog that barked when people came to the farm.

Mr. Story testified that he met the Defendant at church. He said he gave the Defendant $40 the first time he met him because the Defendant said he was "broke." He said the Defendant came to work daily at his farm, although he did not ask the Defendant to come daily. He said he usually found work for the Defendant, who was a good worker. He thought he paid the Defendant in cash and said he had paid the Defendant as much as $100 several times. He did not remember if he paid the Defendant's bills. When asked if he was aware the Defendant had financial difficulties, he said the Defendant could not find a job. He said he ate lunch with the Defendant but did not remember the circumstances. He said he probably bought the Defendant's lunch. He recalled an occasion when the Defendant, the Defendant's wife, and the Defendant's son came to his house for lunch.

Mr. Story testified that he would not recognize the Defendant in the courtroom and did not know whether he saw the Defendant in court. He said he and Harry Barnes, his nephew, were involved in a cattle venture. He said the Defendant had been inside his house a few times. He did not recall if the cattle venture was discussed when the Defendant was inside his house. He said his violin was "very" valuable and had belonged to his father. He said his guitar was worth $70,000 to $75,000. He said that he read in a paper that the Defendant brought a nephew to the Storys' house and that the nephew played the guitar and "loved it." He did not remember if he talked to the Defendant about the guitar's value. He said he owned a shotgun that was valuable because it had been owned by a deceased country

music star. He did not recall if he told the Defendant about the shotgun. He remembered buying beer for people who worked for him and said he would have shared it with the Defendant. He said he tried to give the Defendant money for gas every time the Defendant came to the farm. He said he kept $100 to $115 in his wallet. He said he usually paid the Defendant in cash.

Mr. Story testified that when he went to bed on December 27, 2009, the violin was on the dresser in his room, not on the bed as depicted in a photograph exhibit. Referring to photographs, he said the room was a "mess" and was not that way when he went to bed. Photographs depicted two violins, two bows, and a shotgun. He said that Ms. Story went to bed around 7:00 p.m., that he went to bed around 9:30 p.m., and that he was asleep until he heard a knock at the door. He opened the door because he thought a neighbor was there. He said Ms. Story reached the door before he did. He said he opened the door and saw two "boys" in "[g]ood looking" matching "school coats." He said he turned on two lights as he opened the door, but one light had been broken. He said that when he opened the door, he "got clobbered" and was knocked about ten feet. He said his lip was "[c]ut . . . in two." He did not remember if anyone said anything about his cattle being loose. He said that his lip had not healed and that he had been told it might never heal. He said it hurt to bite. He thought he might have been hit with a piece of 1/2" pipe. He thought he was unconscious at least three times and said he was hit two or three times. He said there could have been a third person he did not see. He said he told the people where to find the money and his wallet. He said that Ms. Story's head and hair were covered in blood, that he thought she had been hit, and that he did not see anyone hit her. He said he did not see the people leave or know if they left together. He said that when he regained consciousness, he was tied up and that he did not remember being tied up. He said Ms. Story had thin skin, which was torn because she struggled against the rope used to bind her. He identified photographs depicting their injuries.

Mr. Story testified that he did not know how long it took to free themselves. He said Ms. Story called the police. He did not remember giving a statement to the police at the hospital. He did not think he would recognize the voices of the people who came into his home. He identified a photograph exhibit depicting the control panel for his gate with the cover on the ground. He said the cover was secured by a nail and did not think the cover had been on the ground on the afternoon of December 27, 2009. He said the control panel worked after December 27 and did not know if the people who came into his home removed the cover.

Mr. Story testified that his hearing was better on December 27, 2009, than it was at the trial. He said that his dogs did not bark on December 27, that they barked at strangers, and that he opened the door because the dogs did not bark. He said the Defendant came to

-10-

his farm looking for work so frequently that it was "aggravating" because he had other things to do. He said the Defendant never came to his farm looking for work after December 27.

On cross-examination, Mr. Story testified that although he had a limited amount of work and money to spend, he sometimes needed the Defendant's help. He agreed that in September, he searched for the Defendant's home because he needed the Defendant's help to bale hay. He thought he and the Defendant had a good relationship. He was unaware of any disagreements between them. He did not recall giving the Defendant the code to open the gate but said he would have had to in order for the Defendant to get through the gate. He thought that after December 27, 2009, the people who installed the gate had to work on the control panel.

Mr. Story testified that the Defendant's fourteen-year-old nephew helped "catch the cows" on one occasion. He did not remember the Defendant's nephew being inside his house and playing the guitar. He recalled discussing the guitar when the Defendant's nephew was at the farm.

Mr. Story testified that he did not remember if he saw two men on the porch on December 27, 2009. He then said, though, that a small "Mexican boy or whatever he was" sat on the porch. He said the other man stood with the door in his hand. He said the Defendant was not one of the men. He did not recall Mr. Pittard but said it was possible he helped with the cattle on December 17. He did not think anything other than his wallet was taken on December 27. When asked if a third person could have been present, he said, "Somebody had taken care of the dogs. I don't know how they didn't bark." He said that he did not have jewelry and that his wife did not wear a lot of jewelry. He said they had lock boxes to keep valuables but did not think they were disturbed during the robbery.

On redirect examination, Mr. Story testified that he did not know how the front of the control panel came off. He agreed he would have preferred to control when the Defendant came to work. He said that he had never seen the people on the porch before December 17 but that they would not have known how to get to the door if the Defendant had not shown them. He said he was an Air Force veteran of World War II and the Korean War and agreed the rope he saw on December 27 was white cotton rope. When shown a photograph, he said it could have been yellow nylon.

Rutherford County Sheriff's Detective Randy Groce testified that on December 28, 2009, he and Detective Kohler went to the Defendant's address. He said they were looking for a parking place when they saw two men in a white Ford truck pull out of the driveway. He said they followed the truck to a convenience store and obtained the license plate number. He thought that the truck was registered to Mr. Pittard.

On cross-examination, Detective Groce testified that the passenger went into the store and that the men did not appear to be fighting. He said they followed the truck back to the Defendant's house, which he said was about one-quarter of a mile from the store.

Rutherford County Sheriff's Sergeant Chris Owens testified that he and Detective Steve Brown searched for a white F-150 Ford truck owned by Billy Pittard, which they located at a business on Pennington, impounded, and searched. He identified a photograph of the truck. On cross-examination, he said they searched for the truck at a Spring Street address before locating it at the Pennington address. He said they were asked to locate Charlie Pittard. He said that to his knowledge, Billy Pittard was Charlie Pittard's father and was the registered owner of the truck. He said Charlie Pittard was at the Spring Street residence when they went there.

Rutherford County Sheriff's Detective Steve Brown testified that he helped locate the white Ford truck. He said they received the owner's consent to search it, which they did at a sheriff's facility after the truck was towed. He said that after they found the truck, they located Charlie Pittard at a home on Spring Street and interviewed him. He said he collected Mr. Pittard's clothing and a pair of boots. He said other clothing items were recovered from the Spring Street home. On cross-examination, he said the clothing he recovered was Mr. Pittard's, not the Defendant's.

Rutherford County Clerk's Legislative Secretary and Deputy Clerk Rick Spence testified that as he stepped toward the doorway of his workplace on December 28, 2009, he saw an insurance card. He said he placed the card in the lost and found drawer. He said that around 8:00 a.m., he heard Mr. Story's name in connection with a newspaper article about the crime and realized the insurance card was Mr. Story's. He said the police were notified. On cross-examination, he said his office was two blocks from Spring Street.

Rutherford County Sherrif's Detective Bryant Gregory testified that he assisted in the investigation. He said he went to the Rutherford County Clerk's office and obtained Mr. Story's insurance card. He searched the area where the card was found and found several other items with Mr. Story's name. He said the Defendant's name was written on the back of Mr. Story's agricultural exemption card. He identified a voter registration card, a dentist's card with information about "Cecil's" appointment, and a medical appointment card with information about Mr. Story's appointment. Using a diagram, he identified the locations where the items were found.

Detective Gregory testified that on December 28, 2009, he interviewed the Defendant and Corey Foster. He said that on a later date, he interviewed Charlie Pittard and Ashton Garza. He said Mr. Pittard's hands and feet were examined and photographed, and he

identified photographs of Mr. Pittard's hands and the sole of Mr. Pittard's shoe. Regarding photographs of Mr. Garza's hand, he identified a scratch on Mr. Garza's pinky knuckle. He identified a photograph of Mr. Garza's shoes.

On cross-examination, Detective Gregory acknowledged that he did not find any physical evidence to connect the Defendant with the crime. He agreed that Mr. Pittard's mother lived on Spring Street near where a wallet was found and that Mr. Pittard was arrested at his mother's house. He said the Defendant lived about a mile away from where Mr. Story's items were found.

Detective Gregory testified that cell phone records for the Defendant, Mr. Garza, and Mr. Pittard were subpoenaed. He acknowledged the State did not have evidence to show the Defendant's cell phone's movement in relation to the victims' farm. He said that based upon his experience, this information was not available unless a call was placed. He said that he had seen the records that were received in response to the subpoena, that others had reviewed them, but that he could not interpret the information about the Defendant's cell phone in relation to towers.

Detective Gregory testified that no photographs were taken of the Defendant's hands and feet. He said that when they first contacted the Defendant, the Defendant stated that he knew they were coming and that they would not find anything. He said some socks were found in Mr. Pittard's truck.

On redirect examination, Detective Gregory agreed that he might be confused about the socks and that they may have been gloves. He identified the Defendant's affidavit of indigency showing that counsel was appointed within the six-month period that the cell phone records were available and could have been obtained. He agreed that the defense had been provided with discovery documents that included all the information in the State's possession. He said the Defendant mentioned yellow rope, which was a fact that had not been released to the media or general public. He agreed that yellow rope was used to tie the Storys and that the rope had their blood on it.

On recross-examination, Detective Gregory testified that he disputed that a person could be tracked from the person's cell phone's location if a call was not placed or received. On further redirect examination, he agreed that federal agents could track a cell phone's location at the present moment but that cell phone companies did not have the historical information of a cell phone's location.

On questioning by the trial court, Detective Gregory testified that Mr. Story's items were found in bushes and on the sidewalk. He said no wallet was found. He said the yellow

rope was mentioned in the interview on the evening of December 28, 2009. He said the Defendant was the first person outside law enforcement to mention yellow rope. On further cross-examination, he agreed yellow rope was one of the reasons law enforcement thought the Defendant was involved.

Rutherford County Sheriff's Lieutenant James Philip Martin testified that he responded to the scene after the victims were gone. He said two detectives let him through a gate but did not recall how they opened it. He identified a diagram and photographs of the scene. He said he photographed the scene and collected evidence. He identified an extension cord and a telephone cord that were disconnected and a telephone that had been removed from a wall. He said that drawers were pulled out and that items were in disarray on the floor. He did not see blood on a telephone or in the victims' bedrooms. Referring to a photograph, he identified yellow nylon rope with a red stain and a blood-soaked shirt. He was told that Mr. Story had worn the shirt. He identified a photograph depicting blood spatter on a movable cabinet. He said he did not find blood spatter in the kitchen or on the entry door. He said some blood may have been on a table. He said that he took precautions to avoid stepping in the blood, that he checked his shoes when he finished processing the scene, and that no blood was on his shoes. He identified photographs of footprints in the blood.

Lieutenant Martin testified that a light in the carport had been broken. He identified photographs of a bloody footprint on concrete and a deck outside the house. He identified the rope, shirt, telephones, light bulb sensor, and broken light bulb collected at the scene. He identified a photograph of a package of muffins found outside the house. He said the telephones and the muffin package were submitted for fingerprint analysis because they were the items that were more likely to contain fingerprint evidence. He agreed that no bloody fingerprints were found.

Lieutenant Martin testified that he examined a Ford F-150 truck. He identified photographs of the truck. He said a shop cloth, shoes, a sock, and gloves were in the floorboard. He said a wallet was recovered from the truck's tool box. Disposable gloves were in the driver's door. He said that mail in the truck was addressed to Susan Pittard and that the truck was registered to Billy Pittard at the same address. He said black gloves were recovered between the driver's seat and console.

Lieutenant Martin testified that Mr. Garza's blue Chevrolet Cavalier was impounded and processed. He identified photographs of the car's contents, which included clothing, shoes, a wallet with Mr. Garza's identification, and papers. He said a pair of jeans from the trunk contained a reddish brown substance. He identified items of clothing and footwear relative to Mr. Pittard and the Defendant and oral swabs from the victims that he submitted

for testing. He identified blood standards collected from Mr. Pittard, Mr. Garza, and the Defendant. He identified Mr. Pittard's, Mr. Garza's, and the Defendant's cell phones. He said that the gate's control panel cover was processed for fingerprints but that none were found. He stated that the cover was found on the ground but that the wires and the box did not appear to be damaged.

On cross-examination, Lieutenant Martin did not recall any forensic evidence implicating the Defendant. He said the drive from the Sheriff's Department to the victims' house would take about thirty minutes. He agreed that the victims' house appeared as if someone was looking for something or wanted to disable the telephones. He said a large quantity of dried blood was on the tile by the kitchen table.

On questioning by the trial court, Lieutenant Martin testified that he was 6'2" and could walk underneath the pitched roof of the victims' carport. He said the roof partially blocked the view from the door. He did not know which telephone Ms. Story used to call 9-1-1. He said he arrived at the victims' house around 10:00 or 11:00 on the night of the crimes. He did not recall any lights other than the broken one in the carport and said the house was surrounded by trees.

Tennessee Bureau of Investigation (TBI) Forensic Scientist Miranda Gaddes, an expert in trace analysis, testified that she compared photographs of bloody footprints with shoes collected from the Defendant, Mr. Pittard, and the Cavalier. She said that seven shoe impressions were consistent with one of the shoes from the Cavalier but that due to the lack of individual characteristics, a more conclusive comparison was not possible. She said one of the impressions could have been made with the other shoe from the Cavalier. She said Mr. Pittard's boots and shoes and the Defendant's shoes could not be matched to any of the impressions.

The parties stipulated that if TBI Forensic Scientist Jennifer Spivey, an expert in fingerprint examination and comparison, were called as a witness, she would testify to facts in her report, which stated that no identifiable latent fingerprints were found on the telephones and the muffin box from the scene. Her report was received as an exhibit.

TBI Agent Michael Turbeville, an expert in serology and DNA analysis, testified that blood with Mr. Story's DNA profile was on the shoes and jeans from the Chevrolet Cavalier. He said Mr. Garza's DNA was on the pocket of the jeans. A yellow rope contained the victims' DNA profiles. He analyzed three disposable gloves, and none contained DNA profiles of the victims, the Defendant, Mr. Pittard, or Mr. Garza. One of the gloves contained the DNA of an unknown male, and one contained the DNA of the same unknown male and an unknown female. His report was received as an exhibit.

On cross-examination, Agent Turbeville testified that a presumptive test did not show blood on the Defendant's cell phone. He said the Defendant's DNA was not found on the gloves from the Ford truck. He agreed that the victims' DNA was not found on any evidence collected from the Defendant and that the Defendant's DNA was not on other evidence examined.

Rutherford County Sheriff's Department Systems and Training Coordinator David Hutsell testified that he was the records custodian as part of his job duties. He said that according to the sheriff's records, the Defendant and William Eisenmann were jail inmates and shared a cell from March 26 through 29, 2010.

William Eisenmann testified that he and the Defendant were inmates in the Rutherford County Jail. He said he was incarcerated for driving under the influence and acknowledged that he had been in jail before and after his incarceration in the medical pod with the Defendant. He said he was in the medical pod due to emotional stress from his brother's illness, which proved fatal. He admitted having three convictions for passing worthless checks and one conviction for theft. He said that one of the first things the Defendant said to him after they were placed in the cell together was, "Robbery is just robbery, isn't it?" He said that over the course of a couple of days, the Defendant explained his robbery in detail. Mr. Eisenmann said he had been in jail for about 100 days and did not have access to a television or newspapers.

Mr. Eisenmann testified that the Defendant said he was responsible for the "Eagleville robberies" but that Mr. Eisenmann did not know what he meant. He said he concluded that the Defendant "was highly intelligent in robbing" because the Defendant explained how he had committed the crimes and made sure no possibility existed of his being apprehended. He stated:

> [H]e told one individual that he had gotten that he was going to threaten them with a knife if they didn't participate and help. And then the other one he threatened with a shotgun. And he said he had took somebody's life in another state and that he'd do the same thing with that individual if he didn't cooperate or help. This is just to say that if they were apprehended that they'd have different stories. They wouldn't be able to put the same story together. And this is just what he said. He drugged his woman. Used his woman as an alibi. Left after she was passed out and came back. If they had any kind of lie detector test, where was he, I was home the whole time. . . . That he had met these individuals at church. And as church people do they looked out and tried to help him. Bought him some tools. Put him to work. And then he went ahead at [sic] sold the tools. And then later on came back. I mean he was

fixing up their house, working for the guy. He was getting paid money. And from my understanding from what he said is that while he was there he was being able to see what they had inside the house and whether or not what he wanted to do anything more. By meaning, you know, rob them. Take their stuff. And that's exactly what they did. And they went and borrowed the guy's truck. The daddy's truck from my understanding. . . . Went to the house. Got the older man to the door. Convinced him that his cows were out in the road or whatever. And then they went ahead and they took over the house from there. And subdued him. Subdued the wife. And got whatever they got out of the house.

Mr. Eisenmann testified that he was in a cell with the Defendant for about four days after the Defendant told him about the robbery. He said that when he saw the Defendant a couple of weeks later, the Defendant told him the female victim died. He said that the Defendant was happy because "[i]t made his case stronger" and that the Defendant wished the male victim would die, too. He said that he decided to come forward because of the Defendant's happiness about Ms. Story's death and that on the day he was released, he told his attorney to contact the district attorney. He said that he requested that his probation in four different counties be consolidated in order for him to report to one probation officer but that his request had not been granted.

On cross-examination, Mr. Eisenmann testified that when he told his attorney to contact the district attorney, a plea agreement had already been reached for him to be released on time served. He denied that he was offered reduced jail time in exchange for his cooperation. He said he did not read other inmates' newspapers when he was in jail. He said the Defendant did not specify who knocked on the Storys' door or "took the first hit." He said the Defendant stated that three people were present. When asked about prior testimony in which he stated that the Defendant said the Defendant knocked on the victims' door, he said, "That is not what I said." He said the requirements for two of his probation sentences had been combined. He denied that he offered to testify against another inmate with whom he had contact. He denied that the other inmate admitted to him that he killed his wife or told him any facts about her death.

On redirect examination, Mr. Eisenmann testified that he did not know with which district attorney his attorney discussed his plea agreement or violation of probation. He said he did not receive a "deal" for his testimony. He agreed he did not have a felony conviction. Referring to his prior testimony, he agreed he had said the Defendant and two men went to the victims' door, that one of them knocked, and that Mr. Story came to the door. He said the Defendant did not tell him who knocked. He said the Defendant claimed to have "put together" the plan to rob the victims.

Michael Loyd testified that he knew the Defendant because the Defendant's wife and Mr. Loyd's former wife worked together. He said he met the Defendant after the Defendant was paroled from Pennsylvania. He said that he had attended Eagleville Church of Christ all his life and that the Defendant attended for a time with him. He said the Defendant was baptized. He said that he had known the victims all his life and that his grandfather and Mr. Story had been friends.

Mr. Loyd testified that on December 27, 2009, he was at the Defendant's house playing poker until about 7:00 or 8:00 p.m. He said the Defendant, "Reggie," and Charlie Pittard were at the Defendant's house when he was there. He went to his sister's house and went home between 11:00 p.m. and midnight. He said that when he was home, he received a text message from the Defendant asking for a cigarette but that he did not respond. He said that he learned about the crimes on the evening of December 28 and that he called the Defendant, who sounded "genuinely concerned." He said that he told the Defendant "that it was f----- up what happened to those people" and that the Defendant responded, "I haven't done nothing. You can take pictures of my hands." He thought this was strange and said he was not trying to accuse the Defendant.

Mr. Loyd testified that he and the Defendant corresponded by mail when the Defendant was in jail. He said that the Defendant made a statement of interest to the district attorney in one of the letters but that he had been unable to find the letter. He said things were moved at his house when he and his wife separated and when his house was burglarized. He said his girlfriend read the letter. He said that before he received the letter, he had written to the Defendant and asked why the crimes happened to the victims, who were good people, and stated that he would have given the Defendant money. He said the Defendant responded in reference to the night of the crimes, "[Y]ou know I would never hurt those people. I didn't do this. . . . I went out there to steal copper and a generator, but I come [sic] home and I did not hurt those people."

On cross-examination, Mr. Loyd testified that he received about six letters from the Defendant. He said the letter about the night of the crimes was the only one that he had not provided to the district attorney. He agreed the police investigated after the burglary at his house and said he did not know if they took the letter.

Mr. Loyd testified that he knew Mr. Pittard through the Defendant, that they were not friends, and that he had been around him a couple of times. He said he met Mr. Garza once, through the Defendant.

Leah Guill, Mr. Loyd's fiancee, testified that she had met the Defendant's wife once but did not know the Defendant. She said that after she began living with Mr. Loyd, she

became aware he received letters from the Defendant. She said that at first, Mr. Loyd did not write to the Defendant. She said the first letter she read stated that the Defendant went to the Storys' farm to steal copper and a generator but that he would not hurt them and "didn't do that" to them.

On cross-examination, Ms. Guill testified that she read the Defendant's other letters. She said that the Defendant said he went to the farm to steal copper and a generator and that she thought he meant on the night of the crimes. She said that she did not know what happened to the letter, that they had moved twice, that they had a baby, and that their house was burglarized. She thought two letters were missing. She said the police photographed damage at her home but did not collect evidence.

James Pittard[1] testified that he had been in jail since his arrest for the present case. He said that on December 27, 2009, he lived with his father, Billy Pittard. He said he had "[e]xtremely bad" asthma that required a nebulizer and inhalers. He said that his financial condition was poor in December 2009 and that he had not worked for almost a year.

Mr. Pittard testified that he was at the Defendant's house in the late afternoon or early evening on December 27, 2009. He said that he had known the Defendant for about one and one-half months, that he had met Mr. Garza a few times, and that the Defendant and Mr. Garza were closer than he and the Defendant were. He stated that a person named Mike, who he thought was Mr. Loyd, "Pat," and "Reggie" were there playing poker and that Courtney Damon was there. He did not know Reggie's last name. He did not recall when the poker game ended but said he remained at the house with the Defendant, Ms. Damon, and their son after the others left.

Mr. Pittard testified that the Defendant's financial condition was poor. He said the Defendant made statements about going to Woodbury to get some four-wheelers and dirt bikes. He said the Defendant winked at him, which meant the Defendant wanted to steal them. He said he treated the Defendant's statement as a joke because the Defendant had not previously said anything of this nature.

Mr. Pittard testified that he and the Defendant left the Defendant's house in his father's F-150 truck around 8:30 or 9:00 p.m. to go to Walmart. He said Ms. Damon asked if he would buy groceries for the child. He said that as he looked for a parking space at Walmart, the Defendant asked if he wanted to go with him to steal money and a valuable

---

[1] The witness identified himself as James Pittard. Other witnesses referred to Charlie Pittard and Charles Pittard, James Charlie Pittard, and James Charles Pittard. The indictment lists James C. Pittard as a codefendant. It appears that all refer to the same person.

guitar.  He said the Defendant stated the owners were on vacation.  He did not know the Defendant was talking about the Storys and did not know where they lived.  He said he agreed.  He said that the Defendant called Mr. Garza and that they went to get Mr. Garza.  He said that the Defendant and Mr. Garza talked outside the car, that he could not hear the conversation, and that Mr. Garza and the Defendant got into the truck, which he drove.  He said the Defendant gave him directions to the Storys' house, which they reached around 9:30 p.m.

Mr. Pittard testified that he parked the truck and that he and Mr. Garza put their socks on their hands at the Defendant's instruction.  He was unsure if the Defendant knew there were gloves in the truck.  He thought the Defendant wore gloves.  He said they jumped over a fence and did not disturb a metal box.  He said he had an asthma attack as they jumped over the fence and panicked.  He said that as they walked to the house, he did not know if anyone had a rope.  He said that he heard barking dogs and that the Defendant said the dogs would not bite.

Mr. Pittard testified that when they reached the house, Mr. Garza went up the steps while he and the Defendant stood below them.  He said Mr. Garza knocked on the door and told Mr. Story that his cattle were on the road.  He said that Mr. Garza hit Mr. Story and that the Defendant pushed him up the steps.  He said that Mr. Story was on the ground when he entered, that Mr. Garza was putting Ms. Story on the ground, and that he held down Mr. Story.  He said the Defendant entered the room, threw the rope, and told him and Mr. Garza to tie up the victims.  He thought the rope had been in his father's truck.  He said Mr. Garza tied up the victims.  He said that the Defendant went to another room and that he did not see him again inside the house.  He stated that they were in the house a few minutes, that he was scared, and that his chest was tight.  He said he ran outside because he was scared.  He said he heard yelling and "[s]truggles" as he left.  He said he planned to leave with or without the Defendant and Mr. Garza, but he kept having to stop to catch his breath because of his asthma.  He said that they ran up behind him, that the Defendant tried to pull him, that they ran ahead of him, and that the Defendant got into the driver's seat of the truck.  He stated that he was in the front passenger seat and that he did not see any property that might have been taken from the Storys' home.

Mr. Pittard testified that he told the Defendant he thought he should go to the hospital due to his asthma.  He said the Defendant told him "no" and seemed unconcerned.  He said the Defendant stated that he had to get home first.  He said the Defendant got out of the truck at the Defendant's house and that he and Mr. Garza went to Mr. Pittard's aunt's house for him to use his nebulizer.  He said his sister saw blood on his pants and asked what it was, but he told her "not to ask what she didn't want to know."  He said he took Mr. Garza home and changed clothes.  He said that he saw Mr. Garza throw out something when they were near

his aunt's house on Spring Street, that he asked what it was, and that Mr. Garza said it was his socks. He said that after he dropped off Mr. Garza, he returned to his aunt's house, where he spent the night. He said his clothes were washed before they were given to the police. He said he felt bad about what happened to the victims. He said he had not been offered anything for his testimony. He agreed that although he did not assault anyone, tie up anyone, or take any property, he was guilty of the offenses.

Mr. Pittard testified that the Defendant was in charge on the night of December 27, 2009. He said he and Mr. Garza did what the Defendant said. He said he voiced second thoughts to the Defendant after they left Walmart. He said the Defendant asked him if he would I rather get his throat cut or have the Defendant "go after" his wife and son. He said he saw the Defendant the next day around 10:00 a.m. when he went to pick up his inhalers and nebulizer at the Defendant's house. He said that at Ms. Damon's request, he went to a market to buy groceries for the Defendant and Ms. Damon's child.

Mr. Pittard testified that when they were at the victims' farm, the Defendant stated that he knew the code to open the gate but told them to jump the fence. He said that when he realized people were in the house, he did not think he could back out. He said he was afraid for his wife and son.

On cross-examination, Mr. Pittard testified that he had financial difficulties at the time and agreed he told a deputy at the jail that he committed the crimes for the money. He agreed he sometimes stayed overnight at the Defendant's house. He said that he and his wife lived with his father but that they were having marital difficulties and that she often stayed with her mother. He agreed that he knew Cory Foster and that Mr. Foster had worked for the Storys. He said he did not drive away when the Defendant was out of the truck talking to Mr. Garza at Mr. Garza's house because he was thinking about what might happen to his family later. He did not see the Defendant with a knife or a gun that night. He denied taking the Defendant to the Storys' farm several times after the Defendant's car was repossessed. He denied cutting trees for the Storys.

Mr. Pittard testified that from Mr. Story's point of view at the door, he would have seen only Mr. Garza. He agreed there was a lot of blood on the floor when he held down Mr. Story as Mr. Garza tied up Ms. Story. He agreed he kneeled in the blood with his right knee but did not think he stood in the blood. He agreed he asked his mother to wash his clothes later that night. He said his mother was unaware of the circumstances. He said he told his mother he helped someone and got blood on him. He agreed that he helped move the Defendant and Ms. Damon's household belongings about a week before the crimes and the Defendant saw the rope Mr. Pittard's father kept in the truck. He did not recall helping the Defendant make a rope swing a few days before the crimes. He did not recall any

conversation about going to the victims' farm to steal a generator. He stated that he did not see the rope as they were walking down the victims' long driveway and that he first saw it when the Defendant threw it at him and Mr. Garza. He said the Defendant ran through the kitchen while telling Mr. Garza and him to tie up the victims. He said that Ms. Story was conscious, that Mr. Story was conscious but lay still on the floor, and that both would have been able to hear their voices. He said he and Mr. Garza wore hoodies and thought the Defendant wore a toboggan but said the Defendant's face was not covered. He said nothing was put over the victims' faces. He said the victims could not move their heads because they told them not to move.

Mr. Pittard agreed that he and Mr. Garza were confined to the same Rutherford County Jail pod for a few minutes but said he did not know Mr. Garza was there until after Mr. Garza moved. He said they were in the same pod in the Cannon County Jail for about six days. He agreed he and the Defendant were together for four or five hours on December 28, 2009. He agreed that although he had not received special treatment for his testimony, he "prayed" the district attorney would take it into account in disposing of his charges.

Mr. Pittard testified that he and Mr. Eisenmann were in a Rutherford County booking cell together on the day a previous trial began. He said that Mr. Eisenmann asked him about his case but that he told him he did not want to discuss it. He agreed, though, that they discussed a "little bit about it." He said Mr. Eisenmann was in the Cannon County Jail but in a different pod. He agreed that he and Mr. Foster were friends and that Mr. Foster knew where the victims lived. He said that despite his financial condition, he was not worried about getting money from the victims once the Defendant threatened his family and that he participated because of the threat.

On redirect examination, Mr. Pittard testified that he was in the pod with Mr. Garza within the first week he was in jail. He thought he gave his statement on December 30, 2009. He was unsure if the rope came from the truck but thought it did. He said the Defendant's only statement in the victims' house was, "Tie them up." He said they kept the victims' faces down. On recross-examination, he agreed it would not have taken long for the Defendant to grab the guitar and follow him when he ran from the house. On questioning by the trial court, Mr. Pittard said it was dark when they were at the victims' house.

Rutherford County Sheriff's Detective Gregory Tillman was recalled by the State and testified that he and Detective Kohler interviewed the Defendant on December 29, 2009. He said the Defendant was advised of and waived his *Miranda* rights. An edited version of the video statement was played for the jury in two segments. In the first segment, the Defendant said he was not present for the crimes but knew "everything." He offered to wear a recording device in order to obtain incriminating evidence from the people involved. He offered to let

a detective go with him. He said he would not flee if he were released and insisted the detectives guarantee he could go home to his family that night. He declined to give any information about the crimes.

Eventually, when the Defendant was asked for specific information, he said the victims were tied with a yellow rope. He said that he was at home on the night of the crimes and that he played poker with Mr. Loyd and Reggie Haynes. When asked why everything on December 28, 2009, and earlier was deleted from his cell phone, he said he "always" deleted calls due to the volume and his wife's suspicions he was unfaithful to her. He agreed Mr. Story had been good to him and said he felt bad the crimes happened to Mr. Story. He continued to deny he was at the victims' house on the night of the crimes and said he had never touched the victims. Detective Tillman testified that he knew little about the case when he agreed to assist Detective Kohler with the interview and that he was surprised when the Defendant mentioned the yellow rope.

In the second segment of the video recording, the Defendant stated that he "knew everything" about the drug dealers on his street. He said that when Mr. Loyd told him about what happened to the victims, Mr. Loyd said the police would probably want to talk to the Defendant. He said he knew "the whole f------ story" about the crimes. He said that although he felt bad for Mr. Story, he was concerned for his family. He continued to insist he would not reveal any information unless he was released and said that the police would not solve the crimes without his help. He said the person who committed the crimes was too "good" to be caught otherwise. He said rope was left at the scene. He said that he knew Mr. Story did not have money in his house but that Mr. Story had a $250,000 or $275,000 guitar and a fiddle. He said that every time Mr. Story paid him, he gave him a few dollars and wrote him a check. He said Mr. Story never had much cash. He restated his "offer" that he be released in exchange for getting an incriminating statement from the perpetrator of the crimes. He said he would not say anything unless he received a guarantee he could go home. He said he could get the perpetrator's clothes. He said that he did not hurt or tie up the victims and that he was not present. He said that if he were asked names, he would not identify the people responsible. He said Mr. Loyd told him the victims were tied up and beaten.

On cross-examination, Detective Tillman agreed that to his knowledge, the Defendant was not allowed to wear a recording device to try to get incriminating statements from the people involved in the crime. He interpreted the Defendant's statements to indicate that the Defendant thought he was in the situation because of his friends.

On redirect examination, Detective Tillman testified that he did not allow the Defendant to wear a recording device because he thought the Defendant's offer was to avoid the interview. He thought the Defendant was a flight risk and a danger to society.

Rutherford County Sheriff's Detective Steve Kohler testified that he was the lead investigator in the case and was called to the victims' house on December 27, 2009. He said that Detective Mayercik was present and that the victims were no longer there. He said they collected and documented evidence. After being at the home for three to four hours, he went to a local hospital to see the victims but learned they had gone to Vanderbilt Hospital because Mr. Story required further treatment. He arrived at Vanderbilt Hospital around 4:30 a.m. He said that Mr. Story appeared to have been "severely beaten" and that he decided he should speak with Mr. Story later about the details of the crimes.

Detective Kohler testified that around 8:00 a.m. on December 28, 2009, he went to Eagleville Church of Christ and spoke with Rev. Lawyer about what had happened. He said Rev. Lawyer provided him with a church directory, showed him a photograph of the Defendant and the Defendant's family, and talked with him about the Defendant.

Detective Kohler testified that he returned to the victims' home to look for any evidence the police might have missed. He said Mr. Barnes, John Story, and Rev. Lawyer were cleaning the house. He said that after he left the house, he asked another officer to research the Defendant's identifying information. He and Detective Randy Groce went to the Defendant's address about 3:00 p.m. He said they saw a Ford truck arrive and a person who resembled the Defendant get into the truck. He said they followed the truck to a store and saw the Defendant go inside to make a purchase. He said he obtained the license plate information, which showed the truck was registered to Billy C. Pittard, Charles Pittard's father. He agreed this was the first information connecting Charles Pittard to the crimes. He did not think there had been any newspaper accounts of Billy Pittard's name or his ownership of the truck that was used in the crimes. He did not think the information had been made public.

Detective Kohler testified that on December 29, 2009, at 9:30 a.m., he was notified that a person in the clerk's office had found some of Mr. Story's belongings. He said the Defendant's name was written on the back of one of the items. He agreed the items were found "fairly reasonably close" to Mr. Pittard's aunt's house on Spring Street.

Detective Kohler testified that he and other detectives searched the Defendant's house after receiving his consent. He said that the Defendant stated that they could search all day long but that they would not find anything in his house because he was smarter than that. He said the Defendant stated that if he committed a crime of this nature, he would have disposed

of the evidence. He said they inspected the clothes the Defendant wore and the clothes in the house for possible blood stains but did not collect any evidence. Regarding the Defendant's interview, he agreed he was involved in a discussion about the Defendant's being allowed to leave and wear a "wire" and said they decided not to allow it. He said the information about a yellow rope was a "very closely guarded secret" when the Defendant mentioned it. He agreed the Defendant told the authorities he could get the people involved and their clothes from the crimes. He considered it evidence that no blood was on the violin and the guitar and said he would expect to find blood on them if a person participated in subduing and restraining the victims and touched the violin and the guitar. He considered it evidence that no blood was in the ransacked rooms. He agreed no physical evidence connected Mr. Pittard to the crimes.

Detective Kohler testified that the Defendant's cell phone records showed that his cell phone was not used between 9:17 p.m. and 10:12 p.m. on December 27, 2009. He said the Defendant made a call to #777 at 10:12 p.m. He did not know the meaning but said it was a code. He said he was unable to determine a person's location using cell phone records if the person was not using his cell phone. He said cell phone records showed calls between the Defendant and Mr. Garza throughout the day. He said that a call was placed between the Defendant and Mr. Garza at 10:33 p.m., that calls were placed between the Defendant and Mr. Pittard at 9:17 p.m. and 10:32 p.m., and that he thought calls were placed between Mr. Pittard and Mr. Garza.

Regarding his own Verizon cell phone, Detective Kohler testified that he pushed 7 to erase a voice mail message and play the next message. He said #777 could indicate a person erasing messages, but he did not know if all cell phones operated the same way.

Detective Kohler testified that he met Mr. Eisenmann through an assistant district attorney general when Mr. Eisenmann was in jail a couple of months after the crimes. He said that on a previous date when Mr. Eisenmann was being released from jail, Mr. Eisenmann contacted the assistant district attorney general and said he had information of interest and provided his contact information. He said Mr. Eisenmann contacted the assistant district attorney general later and talked to him. He said that Mr. Eisenmann later came back to jail as an inmate and that at that point, Detective Gregory, the assistant district attorney general, and he talked to Mr. Eisenmann about information related to the crimes. He stated that they also talked to him again in preparation for an April 2011 proceeding and that Mr. Eisenmann provided consistent information. He said Mr. Eisenmann told them prior to the April 2011 proceeding that he had never met Mr. Pittard. He said Mr. Eisenmann's previous statements were consistent with his trial testimony. He said no information was released to the public or the media about the Defendant's selling some tools. Regarding Mr. Pittard's testimony about meeting Mr. Eisenmann in a booking cell, he said inmates were held there

before being brought to the judicial building where the court was located. He said that he was involved in several interviews of Mr. Pittard before his testimony in April 2011 and that Mr. Pittard had not added anything to his testimony at the present trial from anything he previously told Detective Kohler.

On cross-examination, Detective Kohler testified that although he received information about the location of the cell phone towers used for Defendant's calls, he did not have the subpoenaed documents with him. He estimated it would take fifteen minutes on a Sunday night to travel from the victims' farm to Murfreesboro. He did not think it was unusual for a person to call others to establish an alibi or to ensure no one was going to talk about the incident. He learned that Cory Foster had worked at the Storys' farm but said Mr. Foster was never a suspect. He agreed Mr. Foster had property from the Storys' farm in his possession but said they could not verify it was stolen. He agreed the Defendant was arrested about one and one-half days after the crimes but did not know if this explained why the Defendant never returned to the Storys' farm to work.

Detective Kohler testified that although he did not see Mr. Pittard on December 28, 2009, when he followed the white truck in which the Defendant was the passenger, he learned through the investigation that Mr. Pittard had been the driver. He said that within the past few weeks, he searched for a fire box or jewelry buried in the Storys' barn but did not find anything.

On redirect examination, Detective Kohler testified that he did not know of any calls to Mr. Pittard and Mr. Garza on the night of December 27, 2009, other than from the Defendant. He agreed that the 9-1-1 call was received at 10:13 p.m. and that the Defendant's cell phone was active at 10:12, 10:32, and 10:33 p.m. He said the calls "pinged," or operated, through a cell tower "a few miles" from the Defendant's address. He said that when he was at the Storys' farm on the day after the crimes, he did not see the Defendant and that the Defendant never explained his absence. On questioning by the trial court, he said the Defendant's call to Mr. Pittard at 10:32 p.m. lasted five seconds.

The thirty-eight-year-old Defendant testified that he was separated from his wife, Courtney Damon, and that they had a four-year-old son. He said he had been incarcerated for most of his life and had not been employed other than in minimum-wage odd jobs. He had never been diagnosed with an intellectual disability. He said that he had been incarcerated for fighting and stealing and that he stole when he was desperate for money. He said he also had a conviction for possession of marijuana "with the intent . . . to grow it" and "fleeing from the police." He said he tried to fake a urine test at his parole hearing because he had used drugs. He said he was "very high" when he gave his video statement to the detectives.

The Defendant testified that he had associated with Mr. Pittard, Mr. Garza, and Mr. Foster but that he thought at the time they were his friends. He said that he met Mr. Foster after the Defendant was paroled, that Mr. Foster sold marijuana, and that they smoked marijuana together. He said he later met Mr. Pittard and allowed Mr. Pittard to stay at his house because Mr. Pittard had marital difficulties and had no place to live. He stated that he bought marijuana, Xanax, and narcotics from Mr. Garza but that they were not close friends. He said Mr. Garza was not allowed at his house because Ms. Damon did not like him. He admitted he sometimes used money that people gave him for drugs rather than food for his child. He said that although he had stolen, he had never done anything like beat up an elderly couple. He said he did not have anything to do with the crimes. He agreed he talked extensively to Mr. Pittard but not Mr. Garza about his work for and association with the victims. He said Mr. Pittard helped herd the Storys' cattle in December 2009. He said he did not "put Pittard up" to robbing the victims and did not know that Mr. Pittard and Mr. Garza were going to rob the victims. He said that when he talked to them by cell phone that night, he did not know what they had just done. He said he suspected by early morning on December 28 that Mr. Pittard had been involved but not Mr. Garza.

The Defendant testified that he had last been to the victims' house two or three days before Christmas and had dinner with them. He said he met Mr. Story when he began going to church. He said Mr. Story gave him $40 because he was going to work for Mr. Story the next day. He said that Mr. Story asked him to return and that he kept going because he needed the money. He said that if the crimes had not occurred, he would still be working for the Storys. He said no tension ever existed between him and the victims. He said that Mr. Story paid him $100 a day but that he did twelve hours' work. He said that the victims were "great" to him and that he had no reason to commit the crimes. He said he was at the farm almost daily and was unaware he annoyed them. He said his family had dinner with the victims three times and went to the farm other times. He said his son called Mr. Story "Papa."

The Defendant testified that Mr. Story liked to talk about his nice possessions. He said that the guitar did not look valuable but that Mr. Story told him it was worth $70,000 to $75,000. He acknowledged he knew the code to the gate. He said he had enough common sense to cover his face if he were to rob someone. He said that if he were going to commit a robbery, he would rob a liquor store or a gas station, not someone who knew him. He had never seen a generator at the Storys' farm. He said that he put copper from the farm in the trunk of Mr. Foster's car, that Mr. Foster's father was in the HVAC business, that Mr. Foster said he could get rid of it, and that he should not have done it. He denied taking gas from the farm and said Mr. Story gave him gas if he needed it.

The Defendant testified that he never wrote letters to Mr. Loyd saying anything other than he was not guilty. Explaining his letters, the Defendant said that Mr. Loyd had tried to help him turn his life around, that he felt like he had let down Mr. Loyd, and that he wanted Mr. Loyd to pray for him because he was in jail away from his family. He acknowledged he talked to Mr. Eisenmann while they were in a jail cell together. He said he never talked about the crimes because he was innocent.

The Defendant testified that he knew about yellow rope in Mr. Pittard's father's truck from having helped his sister-in-law, Michelle Cole, move two weeks before the crimes and from building a swing for his son two or three days before Christmas. He said he used a tool from the truck and asked Mr. Pittard if he could use the rope for the swing.

The Defendant testified that Mr. Pittard was at his house on December 26, 2009, and spent the night. He said that on December 27, 2009, he played with his son and watched television with his wife and son. He stated that he had no contact with Mr. Garza on December 26 but that on December 27, he talked by telephone to Mr. Garza about bringing him pills or a "blunt." He said he played poker with Mr. Loyd, "Pat," and "Reggie." He said that after Mr. Loyd, Pat, and Reggie left, he asked Mr. Pittard to take him to Walmart, where he bought Christmas gifts. He stated that Mr. Pittard took him home, that he watched television with his wife and son, and that he did not leave the house or his wife's presence again. He said Mr. Pittard drove Mr. Pittard's father's truck that night. He said that Mr. Pittard left his house around 8:30 or 9:00 p.m. and that he had no concerns about where Mr. Pittard was going. He said he talked to Mr. Pittard and Mr. Garza by telephone. He stated that he awoke about 1:30 or 2:00 a.m., that his wife was awake because their son had wet the bed, and that he went to the doorway to smoke. He saw Mr. Pittard pull up between 1:30 and 2:15 a.m. He said he was with his wife and son all night. He was unsure if his wife was awake when Mr. Pittard arrived.

The Defendant testified he had a Cricket cell phone on December 27, 2009. He said he did not loan his cell phone to anyone that night. He said the call he made at 10:33 p.m. was to get drugs and denied he became aware of any crimes against the victims as a result of the call.

The Defendant testified that Mr. Pittard was nervous when he returned. He said that although Mr. Pittard always wore black boots, he was wearing tennis shoes. He said that he asked where Mr. Pittard's boots were and that Mr. Pittard told him not to ask what he did not want to know. He said Mr. Pittard stated, "I f----- up." He said Mr. Pittard did not mention the victims. He stated that he questioned Mr. Pittard about his statement and his boots and that Mr. Pittard said he had done something "serious." He said Mr. Pittard stated that he

made an error by leaving something behind but did not explain what happened. He said he eventually went back to bed with his wife and son.

The Defendant testified that he learned about the crimes when Mr. Loyd called him around 8:00 a.m. on December 28, 2009. He said he was getting ready to go to a parole hearing. He acknowledged that he had drugs in his system and that he planned to use a Visine bottle with his son's urine for the drug test at the parole hearing. He said Mr. Loyd told him that the victims had been bound and beaten, that there was a lot of blood, and that the people who committed the crimes would be apprehended. He said he "put two and two together" and suspected but did not confront Mr. Pittard. He said he was more concerned about his parole hearing.

The Defendant testified that in the days after December 27, 2009, Mr. Pittard did not seem afraid of him. He said, though, that the only contact they had was on December 28, when Mr. Pittard gave him a ride to a store and "hung out and watched TV" at his house. He said he did not question Mr. Pittard about the "Story incident" because he did not want to know. He said he had been in trouble most of his life and did not want to be involved. He thought Mr. Pittard left on the morning of December 28 to take Mr. Pittard's father to work. He said Mr. Pittard did not have a car but was permitted to use Mr. Pittard's father's truck if Mr. Pittard transported his father to and from work.

The Defendant testified that Mr. Foster called the police to identify Mr. Pittard, Mr. Garza, and the Defendant as the perpetrators. He said Mr. Foster wanted a reward. He said he met Mr. Foster through Mr. Pittard.

The Defendant testified that after he was caught with the Visine bottle of his son's urine, he was questioned by Detectives Kohler and Gregory as shown on the video recording previously played for the jury. He acknowledged his use of profanity in the interview was "obnoxious" but said he was truthful with the detectives. He agreed that if he had been involved in the crimes, he would have been concerned about offering to wear a recording device, knowing what Mr. Garza and Mr. Pittard might say could incriminate him. He said, though, he had no hesitation about offering to wear a recording device.

The Defendant testified that he had stolen "hundreds" of times. He said he would never beat up an elderly couple who had treated him as the Storys did. He said his only violent crime involved a fight with a man. He said he would not steal from people he knew. He stated that working for the Storys was his only source of income and that he would have been at their house the day after the crimes if he had not been "locked up." He said that he should have told the detectives the truth and that he wanted a guarantee he could go home to his family.

The Defendant testified that Mr. Garza thought he was better than others because his family was in law enforcement. He said that if he had been involved, he would not have gone to his parole hearing. He denied that he drugged his wife to keep her from knowing his whereabouts on the night of December 27, 2009. When asked why Mr. Foster was never a suspect in the crimes, he thought it was because Mr. Foster identified him. He said Mr. Foster stated he had not received a reward. He said that he needed money on the date of the crimes but that he had a little money. He said he would probably still work for Mr. Story if the crimes had not happened. He agreed he had opportunities to steal from the victims when he was in their home. He could not think of any motive to be involved in the crimes with Mr. Pittard and Mr. Garza.

On cross-examination, the Defendant testified that he took copper from the Storys. He agreed he was "pretty good" at stealing because he had only been caught a few times. He said he was unable to visit the victims as soon as he heard about the crimes because he did not have a car. He stated that he and Mr. Loyd were going to go to Vanderbilt Hospital after Mr. Loyd finished work but that he was unable to go due to his parole hearing. He later acknowledged that he was mistaken about the date of the parole hearing and that he did not visit them on Monday before his parole hearing on Tuesday. He said he could not have obtained a ride to visit the victims from the person who took him to the parole hearing. He said Mr. Loyd decided not to visit the victims after work on Monday.

The Defendant testified that he moved to LaVergne, Tennessee, in 2005 or 2006. He moved to Murfreesboro in May 2009 when he was paroled from Pennsylvania and lived in two apartments at the same address in Murfreesboro. He said he met Mr. Story within two weeks of moving to Murfreesboro. He said that he was "clean" when he was released from prison but that he began smoking marijuana with Mr. Loyd within two weeks of his release. He stated that he had never tried to falsify a drug test before he was caught and that Mr. Foster instructed him how to do it. He said that after the drug test, Detective Kohler took him home and wanted to search his house for drugs. He said he admitted marijuana and drug paraphernalia were at his house. He said he gave the marijuana to Detective Kohler, but he also said Detective Kohler found marijuana under a candle. He said Rev. Lawyer identified him as a suspect to Detective Kohler. He said Rev. Lawyer, not Mr. Loyd, introduced him to Mr. Story.

The Defendant testified that he bought marijuana and pills from Mr. Foster. He said that he spent around $10 per week for marijuana and that Mr. Foster provided free marijuana for them to smoke together. He said he started using pills about two months after his parole. He said that he spent $4 per pill and that he bought one at a time. He said his wife did not have a prescription for Xanax. He said she had a prescription for pain medication that she obtained through TennCare. He estimated he spent $10 to $20 per week for drugs.

The Defendant testified that when hay season began in September 2009, he was not using drugs daily because he was trying to stay clean while on parole. He did not know how much he spent per week for drugs in September. He said he made $500 per week in September. He said that before September, his wife paid their $425 or $450 monthly rent and their other bills from her unemployment benefits. He stated that when they moved to a larger apartment, the rent increased to $600 but that they paid $450 because he performed maintenance work for the landlord. He said Rev. Lawyer gave him about six tools to start a handyman service. He said Rev. Lawyer never asked him to work on his house. He said he used the tools at the victims' farm but did not know what happened to them after he was jailed. He did not remember if he discussed the tools with Mr. Eisenmann.

The Defendant testified that he met Mr. Pittard through Mr. Foster around June 2009 and that Mr. Pittard began staying at his house in October or November. He said that he did not have a car and that his wife's car was repossessed when she could not pay the $75 per week payment. He said that he had probation fines and fees from Pennsylvania and that the utility bill was about $100 per month. He said he did not make $2000 per month working for Mr. Story. He stated that on some days, Mr. Story paid him $8 or $10 and that on other days, Mr. Story paid him $100. He said Mr. Story may have paid him $500 per week on two occasions. He said he was sometimes paid by check rather than cash. He said he received checks twice, "most of the time," and "a couple of times." He said that he did not know Mr. Story to carry cash and that Mr. Story paid for everything with checks.

The Defendant testified that he met Mr. Garza through Mr. Foster in June or July and began buying drugs from Mr. Garza. He said he bought pills for $4 from Mr. Garza once or twice a week. He thought he bought 0.25 ounce of marijuana from Mr. Garza for $25. He said his wife did not like Mr. Garza because he was arrogant.

The Defendant acknowledged calling Mr. Pittard around 10:30 p.m. on December 27, 2009. He disagreed he testified on direct examination that the call was about drugs and said he did not remember why he called Mr. Pittard. He said he called Mr. Garza looking for drugs that night. He thought he sent a text message to Mr. Loyd asking for a cigarette, not drugs, because he was out. He said Mr. Loyd did not bring him a cigarette. When asked how he had a cigarette to smoke when he awoke around 2:30 a.m., he said he walked to a store two blocks away to buy them. He said he was mistaken when he testified that he was with his wife all night and did not leave the house. He denied he went somewhere else. He said he did not think he went to Reggie Haynes's house but then said he might have gone.

The Defendant testified that although he did not know how much money he had on December 27, 2009, it was less than $100. He agreed he had rent due at the first of the

month and said that although he had a probation meeting on December 29, he had already paid his fees.

The Defendant testified that the poker game took place around 6:00 to 8:00 p.m. on December 27, 2009. He said everyone except his wife, son, and Mr. Pittard left by 8:30 p.m. He said that he lost $5 in the game and that Reggie won the game. He thought Reggie came back to his house that evening but did not know when. When asked about his lack of memory, he said he knew he was not at the Storys' house. He agreed he smoked marijuana that night.

Regarding the trip to Walmart, the Defendant testified that he was buying a Christmas gift on December 27, 2009, because the recipient was out of town and the gift would be less expensive after Christmas. He did not recall if Mr. Pittard went inside Walmart and said he was inside for twenty to thirty minutes. He said the defense tried unsuccessfully to obtain video recordings from Walmart.

The Defendant testified that he went to bed before his wife and son on December 27, 2009, and did not know the time. He said he watched a DVD in his bedroom. He said he had gone to buy the cigarettes before he went to his bedroom. He said that before he went into the bedroom, he had been outside talking to Mr. Loyd. He said that their doors were near each other and that they both smoked outside. He said that when he was outside talking to Mr. Loyd, he still had cigarettes.

The Defendant testified that after Mr. Pittard said he "f----- up," the Defendant was not worried about Mr. Pittard staying at his house because the Defendant was not involved in anything Mr. Pittard did. He said that when Mr. Pittard said he left something behind, Mr. Pittard meant the rope. He thought Mr. Pittard had already been to see his mother and had his clothes washed before Mr. Pittard came to his house.

The Defendant testified that when Mr. Loyd called him on December 28, 2009, Mr. Loyd stated that something happened to the Storys and that Mr. Loyd would come to tell him about it during his break. He said he did not learn the details until Mr. Loyd came to see him around 9:00 a.m. He said Mr. Loyd told him that someone broke into the victims' house and that they had been bound and beaten. He did not think Mr. Loyd said they were robbed. He said Mr. Pittard was not at his house when Mr. Loyd told him about the victims. He did not know how long it took Mr. Pittard to take Mr. Pittard's father to work because Mr. Pittard had only had his father's truck for about a week. He said he could have seen the yellow rope two weeks earlier, though, because Mr. Pittard sometimes used the truck before that. He said he did not ask if Mr. Pittard was involved in the incident with the victims because he would have been in trouble as a parolee if he did not report it. Regarding Mr. Pittard's taking him

to the store on December 28, 2009, he said that he did not recall what he bought but that it was not food for his son because his wife received food stamps. He said Mr. Pittard did not stay overnight on December 28.

The Defendant testified that Dustin Andrews took him to his parole hearing. He said that he smoked marijuana before meeting with his parole officer and that he had taken pills, although not that day. He thought he smoked marijuana with Mr. Andrews that morning. He said that when he went into the bathroom for the drug test, the Visine bottle made a noise, and he admitted after being asked that he had it. He was told his parole would be violated but not that he would go to jail. He said Detectives Kohler and Gregory arrived and wanted to search his house. He said that because he was on parole, he was required to cooperate with them. He said he did not know about the marijuana under a candle and agreed it was some he forgot to smoke. He said he gave them a "pot pipe" from a cupboard. He said that although he was handcuffed and placed in the back of a police car when he was taken to his house, he was not told he was under arrest. He said he was taken from his house to the police station in handcuffs. He said Detective Kohler said he would be charged with possession of marijuana and drug paraphernalia. He said that he was not read his rights until he was taken to the police station and questioned and that he was not read his rights before his recorded statement. When asked why he offered to wear a recording device, he said he knew he was not going home.

The Defendant testified that he thought but did not know if Mr. Garza was involved in the crimes with Mr. Pittard because they spent a lot of time together. He told the police he could get the suspects' clothing because he thought he could. He said he assumed but did not know that a yellow rope was used in the crimes. He acknowledged he lied to the police about the rope but said he was not going to lie to avoid detection. He said that he faced being returned to Pennsylvania to serve fifteen months. He agreed that businesses had security cameras and said he was unaware of the victims' house having a security camera. He acknowledged knowing there was a signal at the victims' house when the gate opened.

The Defendant admitted his prior convictions for burglary, forgery, cultivating marijuana, five counts of grand larceny, and fleeing from the police. He said that if he had planned to flee after the crimes, he would not have gone to his parole hearing.

The Defendant testified that he would not be surprised if his wife said he did not wake when their child wet the bed. He agreed his wife and he were both involved with other people now, and when asked if he expected her to provide an alibi for him, he said he did not expect her to do anything for him. He said he did not communicate with his wife, although he admitted she brought their son to visit him in jail. He said that he met his wife in prison

-33-

and that she was a correctional officer. He said she quit her job because of their relationship but denied she was fired.

The Defendant testified that Mr. Foster did not lie about the Defendant's asking him about burglarizing the victims' house. He said that at the time, he was going to burglarize their house because the victims were not home. He said he cared about the victims but needed the money. He said he knew their schedule for being away from home.

The Defendant testified that Mr. Barnes was mistaken about Mr. Story never paying the Defendant with a check. He acknowledged that he might have shown Mr. Loyd his hands when Mr. Loyd asked if the Defendant had anything to do with the crimes. He said that if he had beaten the victims, he would have marks on his hands. He said Mr. Loyd lied about the Defendant's writing an inculpatory letter. He said he had "no clue" why Mr. Loyd would say this.

When shown a *Miranda* rights form, the Defendant acknowledged his signature. He said he was still under the influence of drugs when he gave the videotaped statement, although the form showed the time as 7:05 p.m. and he had used drugs before 9:00 or 10:00 a.m. He acknowledged a Notice of Alibi filed by the defense and agreed that his wife was listed as an alibi witness. He acknowledged that the form also stated that he was at Walmart around 8:30 and 10:30 p.m. and that it stated, "The defendant may call James Pittard to establish the defense of alibi if it is later found that the offense occurred at the same time that he was at Wal-Mart." He agreed that the offense did not occur while he was at Walmart because Mr. Pittard was with him.

On redirect examination, the Defendant testified that the store where he bought cigarettes on December 27, 2009, was about two blocks from his home. He said that on an occasion when he and Mr. Foster rode to the victims' farm, they smoked a marijuana "blunt" and discussed burglarizing the victims' home. He said that it was not a serious conversation and that they were "peacocking." He said he had no advance knowledge of a plan to burglarize the victims' home. He said marijuana made a user "real mellow" and want to "sit around and talk or eat."

On questioning by the trial court, the Defendant testified that on the day of the recorded interview, he had taken Xanax. He said he received specific information about the crimes on the morning of December 28, 2009, from Mr. Loyd but not Mr. Pittard. He said Mr. Loyd told him the victims were bound, beaten, and robbed. When asked why he sent a text message to Mr. Loyd requesting cigarettes at midnight if he had been to the store before going to bed at 10:00 p.m., he said he thought he went to the store after receiving no response

to the text message. He stated that he paid cash for the t-shirt he bought as a Christmas gift at Walmart and that the recipient provided the item to the police.

Courtney Damon, the Defendant's wife, testified that she and the Defendant were separated and divorcing. She said she had been admitted to the hospital the previous day due to anxiety attacks, which had exacerbated her Stage 3 liver disease and caused her to vomit blood. She said that she was given Ativan, that its effects had worn off, and that she was released from the hospital at 7:30 a.m. She said she and the Defendant had a four-year-old son.

Ms. Damon testified that she, the Defendant, their son, and Mr. Pittard had lived in a triplex. She said they were friends and spent time with their neighbors. She said Mr. Pittard was at their house at least five days a week, although he did not have belongings there. She said Mr. Pittard's wife and son visited.

Ms. Damon testified that on December 27, 2009, people came to the house around 5:00. She said the Defendant, their son, Mr. Pittard, Mr. Loyd, and "Reggie" were there. She said Mr. Foster, who lived across the street, may have been there. She said everyone left around 6:00 or 6:30 p.m. She recalled that Reggie left to get lottery tickets and did not return. She said Mr. Foster did not return. She said that later that evening, the Defendant went to Walmart to get a birthday gift for her friend, Starla. She said that Mr. Pittard went with the Defendant to Walmart, that they left around 8:00, and that they returned around 8:30 p.m. She recalled that one of her favorite television shows was starting as the Defendant returned without Mr. Pittard. She said the television show began at 8:30. She said the Defendant told her to send a text message to Mr. Loyd and tell him they had the gift. She said that "we" sent Mr. Loyd a text message and that Mr. Loyd responded that he was in bed and would get it the next day.

Ms. Damon testified that they "sat around" with their son until about 11:00 p.m., when they went into their bedroom. She said that although their son had his own room, he slept in their bed. She stated that the Defendant went to sleep, that she began watching a movie in bed, and that their son was awake. She said she fell asleep during the movie but awoke around 2:30 a.m. because her son had wet the bed. She said she looked at the clock on the microwave. She said she took the child into the bathroom and tried to wake the Defendant. She said she told the Defendant to remove the sheets, but he would not get up. She went to her son's bedroom and slept there. She said that as she went to her son's room around 2:25 to 3:00 a.m., she saw Mr. Pittard asleep on the couch. She was certain that after the Defendant returned from Walmart and until she got up when their son wet the bed, the Defendant did not leave the house. She said it was not possible that he left without her having known it because their son was "attached to him at the hip" and the apartment was

small. She said that on December 27, 2009, she took Wellbutrin, Lortab, and Clonopin, which were prescribed for her.

Ms. Damon testified that she awoke around 8:30 a.m. on December 28, 2009. She said that the Defendant was still asleep and that Mr. Pittard was gone. She said she woke the Defendant when breakfast was ready. Mr. Loyd called and said that something bad had happened, that he needed to talk to the Defendant, and that he could not talk about it on the telephone. She said Mr. Loyd came to their house on his lunch break and told them what had happened to the victims, which was when she first learned of it.

Ms. Damon testified that she took her son to visit the Defendant in jail. She said the child cried for his father. She said she and the Defendant tried not to talk in front of the child because he "picked up" on things. She said that she was testifying because she was subpoenaed to testify and because she was sure the Defendant did not leave home on the night of December 27, 2009. She acknowledged a 2011 theft conviction, which she said involved her stealing food and hygiene products from Walmart when the Defendant was in jail. She said she had a 2005 theft charge in Vermont.

Ms. Damon testified that she and the Defendant shared a cell phone. She said she had the phone on the night of December 27, 2009 and recalled that she called Mr. Pittard to speak with the Defendant while they were gone to Walmart.

On cross-examination, Ms. Damon testified that she met the Defendant when he was incarcerated in Kentucky. She said that she had been a sergeant at the facility and that she voluntarily resigned because she fell in love with the Defendant. She said they lived in Vermont, then moved to Antioch, Tennessee. She said they had also lived in La Vergne before moving to Murfreesboro. She agreed the Defendant went to Pennsylvania at some point to serve a sentence following a parole violation. She said that from 2005 until she was laid off in 2009, she worked full-time as a training manager and administrative assistant at Simplicity Gourmet in La Vergne. She said that after she was laid off, she received unemployment benefits and food stamps. She said the Defendant worked odd jobs, including drywall construction and work for the victims. She did not remember how long the Defendant worked for the victims but said he worked for them in the summer baling hay. She said she and their son sometimes went to the victims' farm. She did not recall if the Defendant worked for the victims through December 2009.

Ms. Damon testified that she was unaware of Mr. Foster's ever bringing marijuana to her house. She said that if he did, it was used outside and that she did not see it. She stated that she never saw the Defendant and Mr. Foster smoke marijuana together and that the Defendant did not tell her he smoked marijuana with Mr. Foster. When asked if the

Defendant had ever brought marijuana into their house, she responded that the marijuana found by the detectives had been brought there by Mr. Pittard. She said she had seen the Defendant smoke marijuana.

Regarding a prior written statement, Ms. Damon testified that although she had said Reggie left around 10:00 p.m. on December 27, 2009, she had mistakenly referred to when Reggie left on December 26. She said she talked to the police a second time and corrected the error. She said she had given the Defendant a gift card to buy the gift at Walmart. She said the gift was for Mr. Loyd's child, who was in Alabama at the time. She said they waited to buy the gift because she had not had the money earlier. She was certain the Defendant did not leave their bed on December 27, 2009. She acknowledged he could have "flipped the mattress" while she was in the bathroom but maintained she was sure he did not leave the house. She was unaware of the Defendant's talking to Mr. Pittard that night after they went to bed.

Ms. Damon testified that Mr. Pittard always wore a black and white bandanna, black boots, jeans, a black studded belt, and a black hoodie but did not recall what he wore when she saw him on the couch that night. She said she never saw him after December 27, 2009. She did not know if Mr. Pittard came to her house to take the Defendant to the store on December 28. When asked if she took Xanax, she said she did not have a prescription for it. Regarding prior testimony that she had taken Xanax since she was sixteen, she said it was "almost the same thing" as Clonopin. Regarding prior testimony that the Defendant returned from Walmart around 9:25 or 9:30 p.m., she said she was unsure whether it was around 8:30 or 9:30. She said she did not remember the time from two years ago when her television show began.

Ms. Damon testified that the Defendant and Mr. Story drank beer together three or four times. She said that her son went to the Storys' farm about two times and that she went about five times. She said she had taken dinner to the Storys but did not eat with them because Ms. Story was always too sick. She said her son called older people he liked "Papa." She denied saying that she was "so out of it because of pills or drugs" on December 27, 2009, that she did not know whether the Defendant left the house. She denied telling Detective Kohler that she was unsure if the Defendant was home all night on December 27. She acknowledged having two driver's licenses, each bearing a different last name. One listed her as Courtney Damon, and the other listed her as Courtney Sandlin. She said Sandlin was her former husband's name.

On redirect examination, Ms. Damon testified that she was positive the Defendant never left home on the night of the crimes. On recross-examination, she said she was equally sure Mr. Pittard did not come into the house with the Defendant when the Defendant returned

from Walmart. On questioning by the trial court, she said the wet bed sheets were not changed until December 28, 2009. She said she did not hear Mr. Pittard enter the home on the night of the crimes. She said that the Defendant smoked, that she thought Mr. Pittard smoked, and that she was sure there were cigarettes at the house on December 27.

On rebuttal proof, Michael Loyd testified that he played poker at the Defendant's house on December 27, 2009, and that he left between 7:00 and 8:00 p.m. He said he went to bed between 11:30 p.m. and midnight and was not in bed at 8:30 p.m. He said he received a text message asking for a cigarette between 11:00 and midnight from the Defendant's cell phone. He assumed the message was from the Defendant because Ms. Damon did not smoke. He did not recall receiving a text message asking him to come get his stepson's Christmas gift that night. He said he received the gift on Monday, which he thought was December 29.

On cross-examination, Mr. Loyd testified that he was sure the time he received the message was not between 10:00 and 11:00 p.m. He said he received the gift for his stepson on December 29. He did not know if it was Monday or Tuesday but was sure of the date. He acknowledged supplying the Defendant with marijuana and smoking it with him.

On redirect examination, Mr. Loyd testified that the Defendant and Ms. Damon came to his house with the gift after 5:00 p.m. He said that if the Defendant was arrested on December 29, 2009, the date could have been December 28.

On recross-examination, Mr. Loyd testified that he and the Defendant did not discuss going to Vanderbilt Hospital to see Mr. Story. He said he received the gift the day before the Defendant was arrested. On further redirect examination, he said he told the Defendant by telephone that the victims' house was burglarized and that the victims were beaten and robbed. He said that he went to the Defendant's house later that day and that he did not tell the Defendant more details other than the incident would be on the news. He said he suspected the Defendant and asked him why the incident happened to the victims. He said the Defendant had boasted about "hitting people so hard that it hurt them pretty bad and things of that nature." On further recross-examination, he said he suspected Mr. Foster was involved. When asked if he suspected Mr. Pittard, he said he suspected anyone who associated with the Defendant. He said he did not suspect Mr. Garza, whom he only met once. On questioning by the trial court, he said he did not tell the Defendant that the victims were bound, only that they were beaten and robbed.

Starla Loyd testified that her divorce from Mr. Loyd was not final. She said she met the Defendant and Ms. Damon because she and Ms. Damon had worked together. She said the Defendant and his family attended church with them. She said she knew the victims as

-38-

church members but did not know them personally. Mr. Loyd told her the Defendant worked for Mr. Story, and she knew of the Defendant's coming home from working on the farm. She said the Defendant was mad because Mr. Story paid the Defendant's utility bill but did not pay the Defendant for working the next day. She said the Defendant talked about "lots of old stuff" and a medicine cabinet with pill bottles at the Story house. She said she was in Alabama when the crimes occurred and returned home a couple of days later. She did not recall if she saw the Defendant on the day she returned but said she saw him after she came home. She said her son received a gift from the Defendant and Ms. Damon when they returned but did not recall if both the Defendant and Ms. Damon were present when he received it. She said Ms. Damon told her the gift, a shirt with an FM radio attached, came from Walmart. She said Ms. Damon told her the shirt had been stolen. She said Ms. Damon did not tell her that it was purchased with a gift card.

Ms. Loyd testified that she and Ms. Damon had discussed the night of the crimes "a little bit." She said Ms. Damon told her that she "kind of remembered" the Defendant going to the store but did not remember when he returned. She said Ms. Damon was sick and took a lot of medication. She said Ms. Damon stated that she "was in and out of it." She was aware of Ms. Damon's "covering for" the Defendant based upon stories they told her. She said that the Defendant took her rent money, that Ms. Damon initially told her the Defendant did not do it, and that Ms. Damon told her later "woman to woman" that the Defendant had done it but that she could not say anything because it would cause a fight.

On cross-examination, Ms. Loyd testified that the Defendant took her rent money before the crimes occurred. She said she did not tell Mr. Loyd about the stolen money to prevent a fight between the Defendant and Ms. Damon and did not know if Mr. Loyd ever learned of it. She acknowledged using marijuana with Mr. Loyd and the Defendant. On redirect examination, she said that two weeks before the trial, she gave the shirt with the FM radio to Detectives Kohler and Gregory. She identified a photograph of the shirt. On further redirect examination, she said Ms. Damon had seen people use marijuana in the Damons' house. On recross-examination, she did not recall Ms. Damon's seeing marijuana use in front of a child.

Detective Steve Kohler testified that he received a shirt from Ms. Loyd a few weeks before the trial. He said he asked Ms. Loyd about the shirt because of Ms. Damon's previous testimony that the Defendant and Mr. Pittard went to Walmart to buy a gift for Ms. Loyd's son.

Reginald Haynes testified that he had been the Defendant's neighbor and that he played poker at the Defendant's house once. He did not recall when he left and said that the Defendant, Ms. Damon, the Damons' son, Mr. Loyd, and two other people were there when

he left. He said he went home. He said that he won the game "[p]laying with chips" and that he did not buy a "Lotto" ticket that night. He said that after he went home, he did not leave again that night. He said the Defendant came to his house between 10:00 and 11:00 p.m. and asked if he knew where the Defendant could get marijuana. He asked the Defendant where Ms. Damon was, and the Defendant said she was at home. He said the Defendant stated that Ms. Damon was "PMSing," that he "had to shut her up," and that he gave her some of her medication. He said his house was "not even a good half a block away" from the Defendant's house. He did not know where the Defendant had been before the Defendant came to his house.

On cross-examination, Mr. Haynes testified that he knew the time the Defendant came to his house because he followed a nightly routine. He said that if someone knocked on his door at 10:00 p.m., something was wrong. He said it was closer to 11:00 than 10:00 p.m. when the Defendant came to his house. When asked if the Defendant seemed disheveled or was sweating or if he had an unusual demeanor, he said the Defendant seemed the same as he had earlier. He said the Defendant was alone. He did not know if the Defendant walked or was dropped off. On questioning by the trial court, he said the Defendant told him the day after the crimes that the incident had been on the news and that the victims were the people for whom he worked.

Ashley Persad, Ms. Damon's sister, testified that Ms. Damon told her that on the night of the crimes, Ms. Damon was "knocked out" from her medication. She said Ms. Damon stated that the Defendant was being accused of involvement and that he had been at home when Ms. Damon went to sleep and woke. She said Ms. Damon did not specify the period of time she slept. On cross-examination, she said that Ms. Damon did not go to bed at the same time nightly and that Ms. Damon did not state the time she had gone to bed on the night of the crimes. She said Ms. Damon did not say when the Defendant went to bed or express concerns that the Defendant left home. She said no discussion occurred about the Damons' son wetting the bed.

Judy Taylor testified that James Charles Pittard was her nephew. She said that she knew generally when the crimes occurred but that she did not know the exact date. She said that about 10:00 p.m. that night, she saw Mr. Pittard sitting in a kitchen chair in her house. She said he wore jeans, boots, and a jacket. She said he came in and said he needed to use his nebulizer, which was in her living room. She said that after he used the nebulizer, he said he had to take someone named Garcia or Garza home. She said she saw Mr. Pittard later that night sleeping on her living room couch. She said he slept on her couch two or three nights per week. She said he was still asleep at 10:00 the next morning. She said he was still wearing jeans.

-40-

On cross-examination, Ms. Taylor testified that she was certain the events she described were on the night of the crimes. She recalled that she, her sister, and her niece were doing laundry when Mr. Pittard arrived the first time. She said her sister washed Mr. Pittard's clothes, which she did not think was unusual. She did not see Mr. Pittard change into a pair of tennis shoes. On redirect examination, she said that on one or two other occasions, Mr. Pittard took home a person named Garcia or Garza. She said detectives came to her house to speak to Mr. Pittard and thought it was two days after the crimes occurred. She said that Mr. Pittard stayed overnight at her house on the night of the crimes and the next night and that the detectives came the next day. On questioning by the trial court, she said she had not spoken with Mr. Pittard about the crimes, did not hear him say anything to his mother or his sister that night, did not know what time he left or returned the next day, and did not know if he took his father to work the next day. On redirect examination, she said Mr. Pittard drove his father's truck. She did not know if Mr. Pittard drove his father to work daily. On recross-examination, she was unsure but did not think Mr. Pittard's father had other transportation.

Dana Pittard, Mr. Pittard's sister, testified that she lived with Ms. Taylor, who was her aunt, and her mother. She said Mr. Pittard stayed at Ms. Taylor's house about every other night and slept on the couch. She recalled an evening when Mr. Pittard called and asked her mother to set up his nebulizer. She said he arrived, used it, and left. She said he was there fifteen to twenty minutes. She said he was in a white F-150 truck and did not know if anyone was with him. She noticed blood on his pants and asked about it. She said he told her, "[T]he less you know the better off you'll be." She said he stated that he was going to return the truck. She said that he returned but that she was in bed. She said she left the next morning without going into the living room. She said she woke during the night and heard Mr. Pittard using his nebulizer but did not know the time. She said she went to sleep about 10:00 that night.

On cross-examination, Ms. Pittard testified that she did not know how Mr. Pittard returned after dropping off the truck. She said her father picked her up for work at 6:30 the next morning. She did not know of Mr. Loyd or Mr. Foster owning a white F-150 truck. On redirect examination, she acknowledged that her father did not live far from her aunt.

The jury found the Defendant guilty of two counts of especially aggravated kidnapping, aggravated robbery, aggravated burglary with the underlying felony as robbery, and conspiracy to commit aggravated burglary with the underlying felony for aggravated burglary as robbery. This appeal followed.

## I & II

The Defendant contends that the evidence is insufficient to support his convictions. In a related issue, he contends that the trial court erred in denying his motion for a judgment of acquittal or a new trial because the evidence was insufficient to support the convictions. The State responds that the proof established the elements of the offenses and the Defendant's identity as a perpetrator and that the court did not err in denying the motion for a judgment of acquittal or a new trial. We agree with the State.

The Defendant asserts, in part, that the trial court was required to weigh, independently of the jury, the evidence and grant a new trial if it disagreed with the jury about the weight of the evidence. *See* Tenn. R. Crim. P. 33(d). We note that this court does not have the authority to act as "thirteenth juror" pursuant to Rule 33(d). *See, e.g.*, *State v. Biggs*, 218 S.W.3d 643, 654 (Tenn. Crim. App. 2006). The Defendant does not contend that the trial court failed to exercise its Rule 33(d) duty, only that the court made the wrong decision. Review of the trial court's decision as thirteenth juror is beyond the scope of this court's review.

On appellate review of a denial of a motion for a judgment of acquittal, we apply the same standard as a question of the sufficiency of the evidence. *See, e.g.*, *State v. Brewer*, 945 S.W.2d 803, 805 n.2 (Tenn. Crim. App. 1997). Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)).

### A. Especially Aggravated Kidnapping

The Defendant was convicted of two counts of especially aggravated kidnapping, one for each victim. In pertinent part, "Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-305(a)(4) (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-32 (2010).

In the light most favorable to the State, the evidence shows that at the Defendant's direction, Mr. Pittard and Mr. Garza accompanied the Defendant to the victims' farm to burglarize the house. When they encountered the victims inside, Mr. Pittard and Mr. Garza tied the victims on the Defendant's instructions using rope the Defendant provided, leaving the victims helpless to escape or call the authorities while the Defendant searched their house for valuables. The parties stipulated that the victims suffered serious bodily injury. The Defendant and his accomplices left the elderly, injured victims bound when they left the house.

Mr. Pittard identified the Defendant as a participant in the crimes. His testimony was corroborated by Mr. Eisenmann's testimony about his conversations with the Defendant at the jail about the crimes and about the Defendant's statement that he was glad Ms. Story died because it helped his criminal case. Mr. Loyd and Ms. Guill testified about the letter in which the Defendant admitted he went to the victims' farm to steal copper and a generator, which Mr. Loyd understood to be on the night of the crimes, although he said the Defendant's letter stated that the Defendant went home and did not harm the victims. Mr. Foster testified about the Defendant's attempt to get him to burglarize the victims' home and the Defendant's saying it would be a "good score." The Defendant mentioned yellow rope to the detectives, a fact that had not been released publicly. Although the Defendant offered an explanation of his knowledge of yellow rope in Mr. Pittard's truck, the jury was free to accept or reject the credibility of his testimony.

Regarding the Defendant's alibi, the Defendant's and his wife's testimony, if credited, would establish that the Defendant was at home at least part of the night of the crimes, but the evaluation and weighing of this testimony was in the jury's province. The Defendant initially testified that he did not leave the house after he returned from Walmart, but he later admitted that he walked to a store to buy cigarettes. Mr. Haynes testified that the Defendant came to his house that evening looking for marijuana. Mr. Haynes said the Defendant stated that Ms. Damon was "PMSing" and that the Defendant "had to shut her up" by giving her medication. Mr. Eisenmann testified that the Defendant claimed to have drugged his wife on the night of the crimes. Ms. Persad testified that Ms. Damon told her that she was "knocked out" from her medication. Ms. Damon testified that she went to sleep before the Defendant. Mr. Pittard testified that the Defendant committed the offenses with him. The jury was entitled to disregard the Defendant's claim of an alibi.

We have not overlooked the Defendant's argument that his previous trial ended with a hung jury. The result of prior proceedings, though, has no bearing on the evidence that was before the jury in the present proceeding and the jury's weighing of that evidence. We also have not overlooked the Defendant's argument that it is illogical to conclude that he committed the crimes because the victims were his only source of income. The jury, though,

concluded from the evidence that despite the victims' providing his only income, the Defendant committed the crimes. We conclude that the proof of especially aggravated kidnapping of the victims is sufficient to support the convictions.

## B. Aggravated Robbery

Relevant to the appeal, "Aggravated robbery is robbery as defined in § 39-13-401 . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a)(2) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (2010). In the light most favorable to the State, the record reflects that the victims were assaulted, that Mr. Story told the intruders where to find his wallet and money, and that they took the wallet. Items from Mr. Story's wallet were later found scattered near the county clerk's office. As we addressed in our analysis of the proof of the especially aggravated kidnapping convictions, the State sufficiently proved the Defendant's identity as a participant in the crimes. The evidence is sufficient to support the aggravated robbery conviction.

## C. Aggravated Burglary

"Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id.* § 39-14-403 (2010). As relevant here, "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft, or assault[.]" *Id.* § 39-14-402(a)(3) (2010). The jury found that the felony accompanying the burglary was robbery.

In the light most favorable to the State, the evidence shows that the Defendant and his companions forced their way into the victims' house by assaulting Mr. Story at the door and restraining the victims. As we have stated, the evidence is sufficient to show that the Defendant committed the felony of aggravated robbery in the victims' house. We conclude, as well, that the evidence is sufficient to support the aggravated burglary conviction.

## D. Conspiracy to Commit Aggravated Burglary

A conspiracy exists when two or more people, "each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." *Id.* § 39-12-103(a) (2010). In the light most favorable to the State, the evidence shows that the Defendant asked Mr. Pittard to go to a house to steal money and a guitar when the owners were gone. Mr. Pittard drove them to get Mr. Garza, with whom the Defendant spoke before Mr. Garza got into the truck. The

three men went to the victims' farm and committed the crimes. Although Mr. Pittard testified that he participated because the Defendant threatened his family, the jury was free to accept or reject the credibility of this testimony. The evidence is sufficient to show that the Defendant agreed with Mr. Pittard and Mr. Garza to burglarize the victims' house in order to commit a robbery.

The evidence is sufficient to support the convictions. The trial court did not err in denying the motion for a judgment of acquittal and the motion for a new trial. The Defendant is not entitled to relief on this basis.

### III

The Defendant contends that the trial court erred in allowing an eight-day break in the trial between the proof and the closing arguments. The State contends that the issue is waived because the Defendant failed to cite any authorities or provide references to the record. We conclude that the Defendant waived the issue by failing to object at the trial.

The record reflects that the Defendant's trial began on Tuesday, September 13, 2011. On the second day of the trial, the judge advised the parties that if the trial was not finished by Friday, it would be continued until the following Friday, when the judge would be back from an out-of-state conference at which he was scheduled to speak. He urged the attorneys to finish the trial by Friday, if possible. The proof concluded on Friday, September 16. The judge advised the jury that due to his prior obligation and to an attorney with a sick family member, they would need to return on Tuesday, September 27, for the remaining jury instructions, closing arguments, and deliberations.

The record does not reflect that the defense objected during the trial, although the issue was raised in the motion for a new trial. Relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error." T.R.A.P. 36(a). Our consideration of the issue is waived.

### IV

The Defendant contends that the trial court erred in excluding the testimony of a 9-1-1 operator, Tracey Hackney, who spoke with Ms. Story. He argues that Ms. Story's statement to Ms. Hackney about how many intruders had been in her house was admissible as an excited utterance. The State contends that the trial court did not abuse its discretion in excluding Ms. Hackney's testimony about Ms. Story's statement, which Ms. Hackney did not remember. We conclude that the Defendant is not entitled to relief.

-45-

During Ms. Hackney's cross-examination, defense counsel asked her what she wrote on the complaint card she created for the call regarding the number of intruders. The State objected. Previously, the complaint card had been received for identification, but it was never made an exhibit by either party. In a jury-out hearing, Ms. Hackney testified that Ms. Story sounded "very upset," "shaky," "elderly," and "pitiful." She said she did not remember what Ms. Story said about the number of intruders, although she had written on the complaint card that there were two. She said she may have written it because Ms. Story may have said there were two people or may have said she heard two voices. The trial court ruled that although the defense established that Ms. Story was upset as would be required for admission of an excited utterance, the witness could not testify about what Ms. Story said because:

> The problem I've got here is [Ms. Hackney] cannot specifically remember what was said to her. And so basically what you're asking me to do is you're asking me to let in as an excited utterance her perception of what was said to her. Now, if she would have said what I think you tried to get her to say, is that there were two men that just walked in here and tied us up and beat us up, then I would let that in. But right now she says I don't remember what I said. I normally would say that.

The Defendant argues that 9-1-1 calls and their contents are admissible under the excited utterance exception to the hearsay rule. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. One exception to the hearsay rule is for an excited utterance, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* at 803(2).

Although 9-1-1 recordings are often admitted as excited utterances, there is no blanket rule of admissibility. *See, e.g.*, *State v. Martha Ann Freeman*, No. M2006-02572-CCA-R3-CD, slip op. at 19-21 (Tenn. Crim. App. Mar. 28, 2008) (concluding that the trial court did not abuse its discretion in excluding a 9-1-1 recording because the proponent did not establish that it was admissible as an excited utterance), *perm. app. denied* (Tenn. Oct. 27, 2008). We note, though, the Defendant did not seek to have a 9-1-1 recording played for the jury.

The trial court correctly found that Ms. Story's statement to Ms. Hackney was an excited utterance. Because Ms. Hackney could not testify from her own memory about Ms. Story's statement, however, her recording information on the complaint card was hearsay and must likewise qualify under a hearsay exception in order to have been admissible. The

Defendant argues generally that the evidence should have been admitted under the excited utterance exception and has not addressed a separate hearsay exception covering Ms. Hackney's documentation on the complaint card of the information provided by Ms. Story.

We note, though, that the Defendant argued at the trial that the evidence was admissible as a record of regularly conducted activity. *See* Tenn. R. Evid. 803(6). The rule provides:

> **Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

In the jury-out hearing, the Defendant elicited testimony to show that Ms. Hackney had knowledge and a business duty to document information about 9-1-1 calls on complaint cards. As we have noted, the trial court expressed concerns about the trustworthiness of the information. When defense counsel specifically raised the records of regularly conducted activity exception, the trial court questioned the witness, "Ma'am, do you remember her telling you that there were two males in the house?" Ms. Hackney responded, "Not without me asking that question. Not without me asking her what happened." The court then asked, "But do you remember in your discussions with [Ms. Story] when she called you upset, hurt, bleeding, did she say to you there were two – or something like that, there were two men in the house or I heard two voices or what did she say to you[?]" The witness responded that she did not remember exactly what Ms. Story said. The court stated without further elaboration that it disagreed with the defense that the evidence was admissible.

The complaint card was received for identification, and it stated in pertinent part:

HOME INVASION, BEEN OVER 15 MINS, COMPL 93 YOA HUSBAND CECIL 86 YOA, BOTH WERE SEVERELY ASSAULTED AND HAD BEEN TIED UP

2 MALES, UNK DESC OR IF WERE IN A VEH, DID NOT SEE ANY WEAPONS, UNK AT THIS TIME IF OR WHAT MAY HAVE BEEN TAKEN

In her statement to the police, Ms. Story said that Mr. Story told her there were two men at the door, not that she personally observed the men. We note that in an offer of proof related to the admissibility of Ms. Story's statements to John Story, he testified that she told him two men broke into the house and beat up Cecil Story and her. He said he did not know whether the information she conveyed to him and the police was based upon her personal knowledge or her recounting Mr. Story's observations.

We conclude that the trial court erred in excluding the evidence. Although Ms. Hackney could not testify of an independent recollection about her conversation with Ms. Story and did not recall the basis for Ms. Story's statement about the number of intruders, Ms. Story was present during the violent home invasion and had the opportunity to observe the intruders. There is no indication the method or circumstances of the preparation of the complaint card were unreliable. The weight to be given the evidence based upon other proof about Ms. Story's basis of knowledge of the number of intruders was a matter for the jury to resolve.

We note that the defense did not ask, nor did the court consider, whether the contents of the complaint card were admissible under the hearsay exceptions for public records or past recollection recorded. *See* Tenn. R. Evid. 803(5) (recorded recollection), 803(8) (public records). In any event, despite the trial court's exclusion of the evidence, other evidence of Ms. Story's statements to the police and John Story about the number of intruders was admitted. In the police statement, she said Mr. Story told her there were two men at the door. John Story testified that his mother told him that two men broke into the house, beat Cecil Story and her, and tied them up. We note, as well, that Cecil Story testified that he saw two men at the door. We conclude that the trial court's failure to admit the 9-1-1 call log was harmless error.

We also note that the Defendant argues that the trial court erred in excluding this evidence in his first trial. As we will discuss in section X, matters that occurred in other proceedings are not relevant in the present appeal and will not be considered. The Defendant is not entitled to relief.

# V

The Defendant contends that the trial court erred in admitting testimony from Michael Loyd and Leah Guill about an incriminating letter written by the Defendant. He contends that the letter's absence was "highly suspect" and that the testimony about it was unfairly prejudicial. The State contends that the trial court did not abuse its discretion in allowing the testimony.

Mr. Loyd testified that the Defendant wrote him several letters. He wrote to the Defendant asking why the crimes happened to the victims, who were good people, and stating he would have given the Defendant money. He later received a letter from the Defendant, which stated, "[Y]ou know I would never hurt those people. I didn't do this. . . . I went out there to steal copper and a generator, but I come [sic] home and I did not hurt those people." Ms. Guill testified that she read a letter from the Defendant to Mr. Loyd in which the Defendant stated that he went to the Storys' farm to steal copper and a generator but that he would not hurt them and "didn't do that" to them. Mr. Loyd and Ms. Guill, who lived together, testified that the letter was lost.

Tennessee Rule of Evidence 1004(1) provides that if an original writing is lost or destroyed other than in bad faith, other evidence of it is admissible. Tennessee Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000) (citing *State v. Gentry*, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, advisory comm'n notes).

The Defendant's inculpatory statements in the letter were relevant to address the Defendant's going to the victims' house to commit thefts on the night of the crimes and his denial of any involvement in harming the victims. Regarding the fact that the letter was lost, Mr. Loyd testified about his efforts to locate it. He and Ms. Guill testified about moving since Mr. Loyd received the letter and a burglary at their house. Evidence of the letter's contents was admissible under Rule 1004(1), provided it was not unfairly prejudicial.

The Defendant argues that the evidence was unfairly prejudicial because the letter itself was never produced. This fact was before the jury and was available for its consideration in assessing the credibility of the witnesses and determining the proper weight to be given to the evidence. Although the testimony about the Defendant's admissions in

the lost letter were prejudicial in the sense that they provided evidence against the Defendant, we do not view the testimony as unfairly prejudicial.

We have considered the Defendant's argument that the existence of unfair prejudice is "extremely compelling" because the State did not call Mr. Loyd or Ms. Guill to testify at this first trial. He has cited no authority for the proposition that a witness's testimony at a retrial is unfairly prejudicial under Rule 403 because the witness did not testify in an earlier proceeding. We do not view the State's decision not to call Mr. Loyd and Ms. Guill at the first trial as having any bearing on its ability to call them as witnesses at the second trial. We conclude that the trial court did not err in admitting the testimony about the Defendant's letter and that the Defendant is not entitled to relief on this basis.

## VI

The Defendant contends that the trial court erred in admitting evidence of the Defendant's previous thefts of copper and gasoline from the victims' farm and his previous discussion of burglarizing the victims' home and stealing cash and property. He argues that the evidence was not probative and was unfairly prejudicial. The State contends that the trial court did not abuse its discretion in admitting the evidence, which was probative of the Defendant's motive and intent. We conclude that the evidence of the previous thefts and the prior discussions of a burglary and theft were properly admitted.

Tennessee Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

-50-

(4) The court must exclude the evidence if its probative value is outweighed
by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The record reflects that the trial court held a hearing on the admissibility of the evidence. Mr. Foster testified consistently with his trial testimony regarding the Defendant's prior thefts of gasoline and copper from the victims' farm and the Defendant's mentioning breaking into the victims' house and taking cash and a guitar. The court found that the evidence was probative and material of the Defendant's motive and intent to commit the crimes, that there was clear and convincing proof of the prior acts, and that their probative value outweighed the danger of unfair prejudice.

The State argues that in conjunction with Mr. Foster's testimony about the Defendant's financial concerns, the evidence shows that the Defendant sought to solve his problems by stealing from the Storys, who were helping him. The State notes that the trial court gave a limiting instruction to limit the jury's consideration of the evidence of the Defendant's prior bad acts to the questions of the Defendant's motive and intent to commit the crimes.

The Defendant's prior discussion of burglarizing the victims' house and stealing property and his prior thefts of copper and gasoline from the victims' farm were probative of the Defendant's intent to burglarize the victims' house and steal from them. The evidence showed that the Defendant had ongoing financial problems and that he stole from the victims to obtain money. The Defendant argues that the State provided insufficient proof that the previous acts occurred. The trial court found otherwise, and the evidence does not preponderate against the court's factual finding.

The Defendant argues that the prior thefts were propensity evidence. Although the danger existed that the evidence of prior thefts would be used to show the Defendant committed theft, the probative value outweighed the danger of unfair prejudice because the evidence, taken with the proof of the prior burglary conversation and the Defendant's financial problems, show his motive and intent to burglarize the victim's home and steal from them.

Regarding the prior conversation about burglary, the Defendant claims the evidence was unfairly prejudicial because Mr. Foster was unsure whether the Defendant was joking

or serious. Mr. Foster's perception of the Defendant's intent is a matter concerning the weight to be afforded the evidence, not its admissibility. The jury heard Mr. Foster's testimony that he was unsure of the Defendant's intent and was entrusted with the decision of the weight to be given to the evidence in light of all of the proof. The evidence was not unfairly prejudicial, and the trial court did not err in admitting it. The Defendant is not entitled to relief on this basis.

## VII

The Defendant contends that the trial court erred in allowing the State to play portions of a video recording of the Defendant's pretrial statement. He argues that it was unfairly prejudicial because he was uncooperative, used profanity, and had visible tattoos. The State contends that the court acted within its discretion in admitting the recording. We agree with the State.

We address, first, the Defendant's argument that "the entire interview, including the portions played for the jury," caused undue prejudice. The Defendant has not explained how the entire interview was unfairly prejudicial, despite the jury's having only viewed portions of it. Our analysis extends to the portions of the interview that were evidence viewed by the jury.

We conclude from our review of the recording that the Defendant's reaction when questioned about the crimes was probative evidence. We also conclude that his lack of cooperation, cursing, and tattoos did not create the danger of unfair prejudice. In the interview, the Defendant expressed both his desire to cooperate with the police to apprehend the people responsible for the crimes and his desire not to cooperate unless he was released. As he notes, he cursed several times. He has not identified the tattoos of concern. Detective Tillman referred to the Defendant's having a neck tattoo when he identified him in the courtroom. In the interview, the Defendant wore a long-sleeved shirt and jeans, and no tattoos were apparent in the recording. We conclude that the trial court did not abuse its discretion. The Defendant is not entitled to relief on this basis.

## VIII

The Defendant contends that the trial court erred in allowing William Eisenmann to testify without being subject to cross-examination about the truthfulness or falsity of his prior testimony in another matter. The State contends that the Defendant waived appellate consideration of the issue by failing to provide an adequate record for review. We conclude that the Defendant has waived any complaint about the trial court's decision not to allow him to play a recording relevant to the issue by failing to include the recording in the record and

that he is not entitled to relief on his claim the trial court erred in ruling that he could not cross-examine Mr. Eisenmann about his prior testimony in an unrelated proceeding.

The Defendant contends that he should have been permitted to cross-examine Mr. Eisenmann about his prior lying under oath in a driving under the influence (DUI) proceeding. He states that he sought to play a recorded news report about Mr. Eisenmann's having told a judge relative to the DUI arrest that his dog, not he, had driven. He claims he played the recording as an offer of proof, although the record does not reflect that the recording was offered in the present proceeding. Although this court granted the Defendant's motion to supplement the record with the record of the first trial, the recording is not in the supplemental record that was filed by the trial court clerk. We note that this court's order provided, in part:

> This [supplemental] record shall consist of the relevant pleadings, exhibits and transcripts from the first trial conducted in this case which are not already included in the current record on appeal. The Appellant does not specify in his current motion which items he wishes to be included in this supplemental record so he shall be responsible for designating those items for the benefit of the clerk of the trial court. The Appellant shall be responsible for ensuring that this supplemental record includes the requested items and is filed within the time allowed.

The supplemental record contains the transcript of the first trial, but it does not contain any exhibits. The list of exhibits in the transcript of the first trial identifies all of the exhibits as photographs. To the extent that the Defendant's appellate complaint concerns the trial court's decision not to allow him to play the recording, our consideration of the issue is waived because he failed to include the recording in the appellate record. *See* T.R.A.P. 36(a).

In the present proceeding, though, Mr. Eisenmann was questioned in a jury-out hearing and testified that when he pleaded guilty in the DUI case, he told the judge, "I said I was told that I said that my dog was driving the car." He explained that the officer who took him to jail told him that he had said the dog drove. He distinguished that he did not tell the judge that the dog drove.

A transcript of his testimony in a jury-out hearing at the first trial was received as an offer of proof. In it, Mr. Eisenmann testified consistently with his testimony at the jury-out hearing at the second trial regarding his statement to the judge in the DUI case. The trial court found that a reasonable factual basis existed to conclude that the conduct occurred but that the conduct did not have probative value.

Tennessee Rules of Evidence 401, 402, and 403 provide:

**Rule 401. Definition of "relevant evidence".-**"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Rule 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.-**All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible.

**Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.-**Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We conclude that the trial court did not abuse its discretion in determining that the evidence did not have probative value. *See* Tenn. R. Evid. 401. The defense sought to impeach Mr. Eisenmann's credibility by asking him if he previously lied under oath by stating that his dog drove a car. He denied that he said it and explained that he said something else. Even if the evidence had some relevance, any relevance would be substantially outweighed by the danger of confusing the issues. *See* Tenn. R. Evid. 403. The Defendant is not entitled to relief on this basis.

## IX

The Defendant contends that the trial court abused its discretion by allowing Rev. Lawyer to testify about the Defendant's financial problems. He argues that Rev. Lawyer lacked personal knowledge and that the testimony was irrelevant, prejudicial, and lacked probative value. The State contends that the Defendant has waived the issue by failing to cite authority to support his claim. As the State notes, the Defendant failed to cite any authority to support his claim that the trial court abused its discretion in admitting the evidence. Appellate consideration of the issue is waived. T.R.A.P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

# X

The Defendant contends that the trial court erroneously admitted evidence in the Defendant's first trial that resulted in a hung jury but would have resulted in an acquittal if the evidence had not been admitted. The State contends that the Defendant has waived the issue by failing to cite authority, make appropriate references to the record, and offer an argument to support his claim. The State contends, as well, that this court lacks jurisdiction to consider whether the trial court erred in evidentiary rulings in a prior proceeding. We conclude that the Defendant is not entitled to relief.

The Defendant's argument for this issue consists of two sentences. Referring generally to evidentiary matters raised elsewhere in his brief, he claims that if the evidence had not been admitted in the first trial, he might have been acquitted or found guilty of a lesser offense. He does not cite any authority for the proposition that this court may consider evidentiary rulings from prior proceedings or that an appellant is entitled to relief in a retrial based upon erroneously admitted evidence from a previous trial. We agree that the Defendant's brief is deficient in failing to cite authority, cite to the record, and make an appropriate argument. Based upon his reference to other portions of his brief that, for the most part, address the evidentiary issues in more detail, however, we will not treat the issue as waived.

Regarding the Defendant's claim that had the trial court excluded evidence at the first trial, he would have been acquitted and his reliance on the hung jury despite the admission of the evidence, we note that for double jeopardy purposes, a defendant's jeopardy is not terminated at a trial in which the jury cannot reach a verdict. *See, e.g.*, *Richardson v. United States*, 468 U.S. 317, 324-25 (1984) ("Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial."); *State v. Conway*, 77 S.W.3d 213, 218 (Tenn. Crim. App. 2001) ("The failure of a jury to reach a verdict is not the equivalent of an acquittal and will not terminate the original jeopardy to which petitioner was subjected." (citing *Richardson*)); *State v. Huskey*, 66 S.W.3d 905, 929-30 (Tenn. Crim. App. 2001). The trial court's rulings in the first trial are otherwise irrelevant. The Defendant is not entitled to relief.

# XI

The Defendant contends that the trial court erred in sentencing him to an effective seventy-three years. The State contends that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

The length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706.

At the sentencing hearing, the presentence report was received as an exhibit. It showed that the thirty-eight-year-old Defendant had a Tennessee conviction for falsifying a drug screen and had out-of-state convictions for felony evading arrest, two counts of marijuana possession, felony escape, four counts of simple assault, accomplice liability for forgery, three counts of grand larceny, cultivating marijuana, and aggravated assault. He pleaded guilty in another state to a violation of the conditions of release. He also had an out-of-state conviction or adjudication for burglary when he was sixteen years old, although the report does not state whether he was charged as an adult or a juvenile. He completed the eighth grade and passed the GED examination while incarcerated. He did not use alcohol but began using marijuana at age fourteen and used it daily before he was jailed for the present offenses. He reported that he had spent most of his life in prison and had not had many jobs, although he had worked for Mr. Story as a farmer and for another person as a handyman.

The trial court found that the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

-56-

(3) The offense involved more than one (1) victim;

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

(5) The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense;

(6) The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great;

. . .

(10) The defendant had no hesitation about committing a crime when the risk to human life was high;

. . .

(13) At the time the felony was committed, one (1) of the following classifications was applicable to the Defendant:

. . .

(B) Released on parole[.]

T.C.A. § 40-35-114 (2010) (1)-(6), (10), (13)(B) (amended 2012). Regarding mitigating factors, the court found that a number of the Defendant's prior convictions occurred when he was young. *Id.* § 40-35-113(13) (2010). The trial court sentenced the Defendant to twenty-three years as a violent offender for each of the especially aggravated kidnapping convictions, eleven years as a Range I, standard offender for aggravated robbery, nine years as a Range II, multiple offender for aggravated burglary, and seven years as a Range II, multiple offender for conspiracy to commit aggravated burglary.

## A.  Length of Sentences

The Defendant contends that the individual sentences are too lengthy. He argues that the trial court erred in applying enhancement factors (1), (2), (5), and (10).

The Defendant argues that factor (1) should not have been applied because four of his five prior felony convictions occurred before 1996 and because his prior felonies were not

violent offenses. We note that the Defendant's argument is based upon incorrect factual premises. Regarding his claim that he has only been convicted of one felony since 1996, the presentence report reflects that in 2008, he was convicted of "fel[ony] evading/eluding [a] police officer" in Pennsylvania and that in 1998, he pleaded guilty to "escape (felony)" in Vermont. He has not explained the significance, if any, of the earlier felonies' having occurred before 1996. In any event, his prior record includes numerous convictions for felony and misdemeanor offenses spanning his adult lifetime.

Regarding his claim that none of his prior felony convictions were for violent offenses, we note that in 1995, he was convicted of aggravated assault in Vermont. We likewise note his trial testimony that his only violent crime involved a fight with a man. Without regard to the factual basis for his argument, we conclude that the language of enhancement factor (1) does not require that a prior offense be violent in order for the factor to be applied. *See id.* § 40-35-114(1). The record supports the trial court's application of enhancement factor (1).

The Defendant argues that the trial court should not have applied factor (2) because the only proof of his leadership in the offenses came from Mr. Pittard's testimony. He has not cited any authority for the proposition that a codefendant's testimony cannot be the factual basis for applying an enhancement factor. In any event, the Defendant's argument overlooks Mr. Eisenmann's testimony that the Defendant threatened Mr. Garza and Mr. Pittard to get them to participate in the offenses and that the Defendant drugged his wife on the night of the offenses in order for her to provide him with an alibi. The record supports the court's application of enhancement factor (2).

The Defendant argues that enhancement factor (5) should not have been applied because there was no proof he "allowed or was impartial to the victims getting injured." He notes Mr. Pittard's testimony that Mr. Garza, not the Defendant assaulted the victims. Enhancement factor (5) may be applied if "[t]he defendant treated, *or allowed a victim to be treated*, with exceptional cruelty during the commission of the offense[.]" *Id.* § 40-35-114(5) (emphasis added). Mr. Pittard and Mr. Eisenmann testified that the Defendant was the leader of the offenses, getting Mr. Pittard and Mr. Garza to go with him to the victims' house. The Defendant directed Mr. Pittard and Mr. Garza to tie up the victims while he ransacked the house looking for cash and valuables. Mr. Garza brutally beat the elderly victims while the Defendant searched the house. The Defendant left the badly injured victims bound in the home. The trial court did not abuse its discretion in applying enhancement factor (5).

The Defendant argues generally that enhancement factor (10) does not apply because no evidence suggests that he had no hesitation to commit the offense when the risk to human life was high. As we have noted, the Defendant was charged with offenses involving the

element of serious bodily injury. We note the similarities between serious bodily injury and high risk to human life. Our supreme court has said, however, that because "evidence of high risk to human life obviously is not required to establish aggravated assault causing serious bodily injury, enhancement factor (10) is not an element of the offense charged and is not precluded from consideration for enhancement," subject to consideration of the particular facts of the case. *State v. Jones*, 883 S.W.2d 597, 602-03 (Tenn. 1994), *superceded by statute on other grounds as stated in State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998); *see, e.g.*, *State v. Richard Ellis Stapleton*, No. E2008-01776-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App. Nov. 10, 2009) ("[O]ur supreme court has said that evidence of high risk to human life does not establish serious bodily injury, meaning that this factor may be applied to factually appropriate especially aggravated burglary sentences.").

As the Defendant stipulated at the trial, the victims suffered serious bodily injury. The proof established that in addition to the Defendant's planning and participating in a home invasion in which he knew the elderly victims, they were brutally beaten causing serious bodily injury, and the Defendant left the badly injured victims bound and helpless in their home. The evidence showed that Ms. Story was sick, frail, and in her nineties and that Mr. Story was in his eighties and bled badly from his injuries. Abandoning the elderly victims in their injured and bound state created a high risk to human life beyond infliction of serious bodily injury inherent in the offense. We conclude that the trial court did not abuse its discretion in applying enhancement factor (10).

We note the State's argument relative to enhancement factor (10) that the Defendant threatened to cut Mr. Pittard's or Mr. Pittard's wife's throat if Mr. Pittard did not participate and that the Defendant pushed Mr. Pittard when Mr. Pittard moved slowly toward the victims' house. We recognize that the factor has been applied if a person other than the victim was imperiled by the Defendant's actions. *See, e.g.*, *State v. Reid*, 91 S.W.3d 247, 312 (Tenn. 2002); *State v. Zonge*, 973 S.W.2d 250, 279 (Tenn. Crim. App. 1997). Although Mr. Pittard testified about the threats, no proof exists that the Defendant possessed a knife and that Mr. Pittard's or his wife's life was at a high risk of danger from the Defendant's threats. There is likewise no evidence the Defendant's pushing Mr. Pittard imperiled his life, nor does the evidence show that Mr. Pittard was endangered by the Defendant's actions inside the victims' house. We reject the State's argument as adding any additional support for the trial court's application of factor (10).

Keeping in mind the "presumption of reasonableness" to be applied, we will review the length of the sentences imposed. *See Bise*, 380 S.W.3d at 707. For the two especially aggravated kidnapping convictions, the Defendant faced a sentence of fifteen to twenty-five

-59-

years as a Range I offender, although the offense is classified as a violent offense for release eligibility purposes. *See* T.C.A. §§ 39-13-305, 40-35-112(a)(1) (2010), 40-35-501(i)(1), (2)(C) (Supp. 2009) (amended 2010, 2012, 2013). For the aggravated robbery conviction, the Defendant faced a sentence of eight to twelve years as a Range I offender. *See id.* §§ 39-13-402; 40-35-112(a)(2). For the aggravated burglary conviction, the Defendant faced a sentence of six to ten years as a Range II offender. *See id.* §§ 39-13-402, 40-35-122(b)(3). For the conspiracy to commit aggravated burglary conviction, the Defendant faced a sentence of four to eight years as a Range II offender. *See id.* §§ 39-13-403, 39-12-103, 40-35-112(b)(4). We conclude that the trial court did not abuse its discretion in imposing within-range sentences of twenty-three years for the especially aggravated kidnapping convictions, eleven years for the aggravated robbery conviction, nine years for the aggravated burglary conviction, and seven years for the conspiracy to commit aggravated burglary conviction. The Defendant is not entitled to relief from the individual sentences imposed.

## B. Consecutive Sentences

The remaining question is whether the trial court erred in imposing all the felony sentences consecutively. Our supreme court recently concluded that the appropriate standard of review for all sentencing decisions, including the determination to impose consecutive sentences, is an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, — S.W.3d —, —, No. M2011-00332-SC-CD, slip op. at 9, 14 (Tenn. Dec. 20, 2013). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

. . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

T.C.A. § 30-35-115(b)(1), (2), (4) (2010).

Our supreme court has concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995); *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The abuse of discretion with a presumption of reasonableness standard, however, does not eliminate a trial court's obligation to comply with *Wilkerson*. *James Allen Pollard*, — S.W.3d at —, slip op. at 13. When a trial court fails to comply with *Wilkerson*, the appellate courts many conduct a de novo review of the record to "determine whether there is an adequate basis for imposing consecutive sentences" or "remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentencing." *Id.*, — S.W.3d at —, slip op. at 14 (citing *Bise*, 380 S.W.3d at 705 & n.41).

In sentencing the Defendant, the trial court stated:

I'm going to find that this case is appropriate for consecutive sentencing. In making that determination I'm going to find the following. That Mr. Damon is a professional criminal who has devoted his entire life to this activity. His criminal record is extensive and he is a dangerous offender to support that and has little or no regard for human life. If you look at the circumstances surrounding the commission of the offense[, they] are aggravated. His confinement for an extended period of time is necessary to protect society. And the aggregate length of these sentences reasonably relate to the offense for which the defendant stands convicted. Also, that he was on parole when the offenses took place. Considering all that as I said I'm going to order that all these sentences run consecutive with each other.

The Defendant contends that the evidence does not support the trial court's determination that he was a professional criminal, that he had a extensive criminal history, and that he was a dangerous offender. Similar to his argument regarding the length of his individual sentences, he states that the evidence shows only one felony conviction since 1995, although he previously asserted 1996. As we have noted, this is not factually correct, nor is it determinative. He was convicted of felonies in 1998 and 2008, and he had at least three earlier felony convictions as well as numerous misdemeanor convictions. The Defendant's prior record is particularly notable given that much of his adult life has been spent in prison, which he acknowledged during his trial testimony. He also argues that he

-61-

"has not one (1) conviction that was a violent crime against a person or society." Again, his premise is factually incorrect. The presentence report, the accuracy of which he acknowledged with one exception that is not relevant, shows a prior conviction for aggravated assault and four prior convictions of simple assault. He acknowledged in his trial testimony that he had a felony conviction related to a fight. He acknowledged stealing when he was desperate for money and said he had stolen "hundreds" of times. He had little employment history and said he had been in and out of prison most of his adult life. We conclude that the trial court did not err in finding that the Defendant was a professional criminal and that he had an extensive criminal history.

Regarding the trial court's finding that the Defendant was a dangerous offender, we note the court's explicit findings that an extended sentence was necessary to protect the public and that the consecutive sentences reasonably related to the severity of the offenses. *See Wilkerson*, 905 S.W.2d at 939; *Lane*, 3 S.W.3d at 461. As the trial court noted, the Defendant was on parole. He nevertheless continued to commit dangerous criminal offenses. The Defendant acknowledged his protracted criminal lifestyle in his trial testimony. The evidence supports the trial court's determination that the Defendant was a dangerous offender.

We have considered the Defendant's argument pursuant to Tennessee Code Annotated section 40-35-102(2) (2010) that his sentence does not reflect "fair and consistent treatment of all defendants by eliminating unjustified disparity in sentence and providing a fair sense of predictability of the criminal law and its sanctions[.]" He complains that after his trial, Mr. Pittard and Mr. Garza accepted plea agreements and received effective four-year sentences. He has attached his co-defendants' plea agreement forms and judgments to his brief. We begin by noting that these documents are not properly before the court. *See* T.R.A.P. 28 (regarding the contents of an appendix to an appellate brief); *Jeffrey Lynn Myers v. State*, No. M2004-02411-CCA-R3-PC, slip op. at 18 n.7 (Tenn. Crim. App. June 29, 2005) ("It is settled law that documents merely attached to appellate briefs cannot be considered by this Court because they are not properly part of the certified record." (citing *State v. Matthews*, 805 S.W.3d 776, 783 (Tenn. Crim. App. 1990)).

In any event, the record reflects that the trial court's determination was based upon many factors, including the Defendant's relative culpability for the crimes, his criminal history, and his prospects for rehabilitation. As the Defendant acknowledges, there is no requirement that codefendants be sentenced identically. *See, e.g.*, *State v. Carpenter*, 69 S.W.3d 568, 576 (Tenn. Crim. App. 2001). The sentencing statutes "permit trial courts to exercise their discretion in determining the sentencing alternatives or the length of the term

of confinement, allowing differences in sentences justified by the nature of the crime, the characteristics and history of the criminal, and the circumstances surrounding the particular offense involved." *Id.* (citing *State v. Russell*, 773 S.W.2d 913, 915 (Tenn.1989)). We conclude that the Defendant has not shown an abuse of discretion in the trial court's imposing an effective seventy-three-year sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE